918 So.2d 1060 (2005)
CII CARBON, L.L.C.
v.
NATIONAL UNION FIRE INSURANCE COMPANY OF LOUISIANA, INC., Starr Technical Risks Agency, Inc., AON Insurance Services of Texas, Inc., and Cheri D. Murray.
No. 2005-CA-0071.
Court of Appeal of Louisiana, Fourth Circuit.
August 17, 2005.
*1061 Walter C. Thompson, Jr., Mark P. Seyler, Barkley & Thompson, L.C., and Gilbert V. Andry IV, Jonathan B. Andry, The Andry Firm, L.L.C., New Orleans, LA, for Plaintiff/Appellant, CII CARBON L.L.C.
David L. Carrigee, Timothy A. Porteous, Burke & Mayer, A P.L.C., New Orleans, LA, for Defendant/Appellee, National Union Fire Insurance Company of Louisiana, Inc.
(Court composed of Judge CHARLES R. JONES, Judge DENNIS R. BAGNERIS, SR., Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
This appeal involves a claim for business interruption coverage under an insurance policy issued to CII Carbon, L.L.C. by National Union Fire Insurance Company of Louisiana, Inc. ("National"). The trial court rendered judgment holding that CII Carbon was entitled to coverage under the contingent business interruption endorsement to the insurance policy but not to coverage under the policy's general business interruption provisions.[1] CII Carbon is appealing that judgment.

FACTS AND PROCEDURAL HISTORY

Facts
CII Carbon owned and operated an industrial facility in Gramercy, Louisiana that processed coke by heat-treating petroleum coke in kilns to make it suitable for use in the aluminum smelting industry. The heat-treated coke was sold to CII Carbon's customers. The heat that escaped from the coke kilns was captured and used to operate a boiler that generated steam. CII Carbon either sold the steam to neighboring plant owners or used the steam to generate electricity that it also sold.
At one time Kaiser Aluminum & Chemical Corporation owned the four facilities that are shown on the schematic diagram in the Appendix to this opinion. The four facilities consisted of a Bayer plant, a chemical plant, a coke plant, and a powerhouse, which supplied power to the other facilities. Kaiser sold the coke plant to CII Carbon and the chemical plant to La Roche Industries, Inc. Kaiser retained *1062 ownership of the Bayer plant and the powerhouse. After the coke facility was sold to CII Carbon and the chemical plant was sold to LaRoche, these two facilities remained connected to the powerhouse.
Pursuant to a series of contracts, the steam produced by CII Carbon was sold to Kaiser for use in its operations at the Bayer plant, which processed bauxite ore into alumina, the raw material for manufacturing aluminum. Also pursuant to the contracts, CII Carbon subleased certain equipment located in Kaiser's powerhouse that was necessary for CII Carbon to operate the boiler that produced the steam that CII Carbon sold. The CII Carbon boiler was located on the grounds of the CII Carbon coke facility, but the boiler could not be operated unless the subleased equipment in the powerhouse supplied water to the boiler and accepted the steam generated by the boiler.
In July of 1999, a massive explosion occurred at Kaiser's Bayer plant. The Bayer plant suffered extensive damage, and there was some damage to the powerhouse equipment that was subleased to CII Carbon. The CII Carbon coke facility itself suffered minimal property damage and was able to resume heat-treating coke shortly after the explosion. CII Carbon, therefore, did not make a claim under the policy issued by National for business interruption losses in connection with its coke production operations.
The claim made by CII Carbon that is the subject of this appeal is the claim for business interruption losses that resulted from the damage to the subleased equipment in the powerhouse. National agreed with CII Carbon that there was damage to the subleased equipment, but National contended that the damage to the subleased equipment had been repaired by November of 1999. Therefore, National paid benefits to CII Carbon for business interruption relating to its steam sales business for the period beginning with the date of the explosion and ending in November of 1999.
After the explosion at the Kaiser Bayer plant, CII Carbon was unable to sell its steam under the contracts involving Kaiser until the Kaiser Bayer plant resumed full operations in 2000. National claimed that CII Carbon was not entitled to business interruption insurance coverage after the subleased equipment in the powerhouse had been restored to the condition it was in prior to the explosion. Rather, National claimed that because the subleased equipment had been "repaired," the only insurance coverage available to CII Carbon for its losses between November of 1999, when the repairs to the subleased equipment had been completed, and the end of December of 2000, when the Kaiser Bayer plant resumed its regular operations, was coverage under the contingent business interruption coverage endorsement to the policy issued to CII Carbon. The policy's contingent business interruption coverage, however, provided a maximum of $500,000 for losses, whereas the business interruption coverage provided a greater amount of insurance.
By November of 1999, the individual items of equipment that were subleased to CII Carbon were repaired or restored to their condition prior to the explosion at the Kaiser Bayer plant. The system at the Kaiser Bayer plant that utilized the subleased equipment was not operational, however, until the end of December 2000. After the explosion, the powerhouse operations were reconfigured in such a way that LaRoche could be serviced more efficiently for its own operations while the Kaiser Bayer plant was being restored. Therefore, only after the Bayer plant was ready to resume its operations was the powerhouse equipment that was subleased by *1063 CII Carbon made operational in its original configuration.

Stipulations
Prior to trial National and CII Carbon entered into a settlement agreement that stipulated that the subleased powerhouse equipment would be considered covered property under the National insurance policy, that Kaiser's powerhouse would be considered a covered location under the policy, and that CII Carbon had a valid claim for a business interruption loss that was incurred from the date of the Kaiser Bayer plant explosion until November 15, 1999, when repairs to the subleased powerhouse equipment were completed. The settlement agreement reserved to CII Carbon the opportunity to prove at trial that after November 15, 1999, until the Kaiser Bayer plant was fully operational again, CII Carbon sustained a business interruption loss as a direct result of damage to the subleased equipment in the powerhouse. CII Carbon also reserved the right to recover for any applicable contingent business interruption loss from November 15, 1999, to December 31, 2000, subject, of course, to the policy limits for contingent business interruption coverage.

Trial
A bench trial was held. The following issues were tried: (1) whether CII Carbon sustained a covered business interruption loss after November 15, 1999, and, if so, the duration and amount of the loss; and (2) whether CII Carbon sustained a covered contingent business interruption loss after November 15, 1999, and if so, the duration and amount of the loss. After the trial, the judge found that: (1) CII Carbon sustained a business interruption loss under the National insurance policy from July 5, 1999, the date of the explosion at the Kaiser Bayer plant, until November 15, 1999, when the subleased powerhouse equipment could have become operational; and (2) CII Carbon sustained a contingent business interruption loss after November 15, 1999, until December 31, 2000, when the Kaiser Bayer plant resumed its normal operations, subject to the $500,000 limit on coverage under the policy.

DISCUSSION

Insurance Coverage
National issued to CII Carbon an insurance policy covering, among other things, losses from business interruption and from contingent business interruption. CII Carbon contends that the business interruption provision covered the loss it incurred from November 15, 1999, until December 31, 2000, as a result of the explosion. National contends that the contingent business interruption provision, not the business interruption provision, covered that loss.

Business Interruption Coverage
The policy provision relating to business interruption losses extended coverage, subject to the terms, conditions, limitations, and exclusions of the policy, to the following:
loss directly resulting from necessary interruption of business caused by destruction of or damage to real or personal property covered herein, except finished stock, and arising from a peril covered hereunder and occurring during the term of this Policy: all while located at locations per schedule attached.
National and CII Carbon stipulated in the settlement agreement that was reached prior to trial that the subleased power-house equipment was covered by the policy even though the powerhouse was not a location listed on the policy's schedule.
The business interruption provisions in the policy further provided:

*1064 [T]his Company shall be liable for the ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business ... for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property... as has been damaged or destroyed, commencing with the date of such damage or destruction....
In the instant case, National is not contending that there was a lack of due diligence in making the necessary repairs to the subleased equipment, so that is not an issue that is before us.
Finally, the business interruption provisions of the policy expressly state that National shall not "be liable for any other consequential or remote loss." Thus, consequential losses are expressly excluded from the policy's coverage.

Contingent Business Insurance Coverage
The contingent business interruption endorsement to the policy extended coverage, subject to the policy's terms, conditions, and stipulations, to cover the following:
loss directly resulting from the necessary interruption of business conducted on the premises occupied by the Insured, caused by damage to or destruction of any real or personal property, not otherwise excluded by this policy, and referred to as CONTRIBUTING PROPERTY (IES) and/or RECIPIENT PROPERTY (IES) and which is not operated by the Insured, by peril(s) insured against during the term of this Policy, which wholly or partially prevents delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured's business, and/or which wholly or partially prevents the acceptance of product(s) produced by the Insured and results directly in the necessary business interruption of the Insured's business.
Consequential losses were also excluded from the contingent business interruption endorsement. Additionally, the endorsement described contingent and recipient properties as properties not operated by the insured. Finally, the duration of the contingent business interruption insurance extended only for the length of time that was required to repair, rebuild, or restore the contributing and recipient properties with the exercise of due diligence.

Assignments of Error
CII Carbon has asserted three assignments of error. First, CII Carbon contends that the trial court erred in finding that CII Carbon was entitled to coverage under the contingent business interruption endorsement to the policy rather than to coverage under the policy's business interruption provisions. Second, CII Carbon argues that the trial court incorrectly construed the meaning of the term "repair" within the meaning of the applicable policy provisions. Third, CII Carbon claims that the trial court incorrectly concluded that the establishment of coverage under the contingent business interruption endorsement precluded coverage under the business interruption provisions of the policy. Because our disposition of the other two assignments of error is predicated upon the interpretation of the meaning of the term "repair," we will discuss the assignment of error relating to that issue first.

Assignment of Error: The Finding That CII Carbon's Subleased Equipment was Repaired by November 15, 1999 was Reversible Error.
CII Carbon claims that the trial court erred when it found that the subleased powerhouse equipment was repaired by *1065 November 15, 1999. CII Carbon contends that the equipment was not repaired until it was again placed in service in the powerhouse in the configuration that had been used prior to the explosion.

De Novo or Manifest Error Review
CII Carbon argues that the meaning of the term "repair," as used in the National policy, is an issue of law and that, therefore, the determination of whether the subleased powerhouse equipment was repaired by November 15, 1999, is subject to de novo review by this Court. Where a question of law is presented to this Court, we must determine "whether the lower court's interpretive decision is legally correct." Sander v. Brousseau, XXXX-XXXX, p. 4 (La.App. 4 Cir. 10/4/00), 772 So.2d 709, 711. In the instant case, however, we find that the issue of whether the trial court properly determined whether the subleased equipment was repaired by November 15, 1999, is a mixed question of law and fact, which is subject to the manifest error standard of review. Tadlock v. Taylor, XXXX-XXXX, p. 17 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 33, writ denied, XXXX-XXXX (La.3/12/04), 869 So.2d 819.
Initially, a legal determination must be made regarding the meaning of the term "repair" under the terms of the National policy. Because "repair" is not a defined term in the policy, the law regarding the interpretation of contracts must be applied. La. Civil Code art.2047 provides in relevant part that "[t]he words of a contract must be given their generally prevailing meaning."
The applicable language in the interruption of business provision in the National policy states that coverage is provided during the time it takes to "rebuild, repair or replace such part of the property" with due diligence after such part "has been damaged or destroyed." The generally prevailing meaning of the word "rebuild" is "[t]o make extensive structural repairs on" or "to remodel or make extensive changes in." Webster's II: New Riverside University Dictionary 981. The generally prevailing meaning of the word "repair" is "[t]o restore to sound condition after damage or injury." Id. at 996. The generally prevailing meaning of the word restore is "[t]o bring back to an original state" or "[t]o bring back into existence or use." Id. at 1002.
After the meaning of "repair", as used in the National policy, is determined, a factual finding must be made. The finder of fact, who was the trial court judge in the instant case, must decide whether the evidence presented at the trial supports the conclusion that the repair of the subleased powerhouse equipment was completed as of November 15, 1999.
In the Tadlock case this Court stated that "[t]raditionally, Louisiana's appellate courts have conceded that the trier of fact is in an extraordinary position to answer these mixed questions of law and fact and therefore, the manifest error rule should apply." XXXX-XXXX, p. 17, 857 So.2d 20 at 33. Our review of the record in this case confirms that the trial court judge ascribed to the words "rebuild," "repair," and "restore" their generally prevailing meanings as required by La. Civil Code art.2074 and that, based on the facts presented at the trial, he could reasonably conclude that the subleased powerhouse equipment was repaired as of November 15, 1999. Therefore, we must conclude that the trial court's findings regarding whether the subleased powerhouse equipment was repaired as of November 15, 1999, were not clearly wrong or manifestly erroneous. Thus, there is no need for a de novo review, which is required when a court of appeal finds that a manifest error of material fact was made by the trier of fact. *1066 Rosell v. ESCO, 549 So.2d 840, 844, n. 2 (La.1989).

Repair of the Subleased Equipment
CII Carbon next asserts that the trial court erred in determining that the subleased equipment at the powerhouse was repaired once the individual items of that equipment that were damaged as a result of the explosion at the Kaiser Bayer plant were repaired. CII Carbon contends that the subleased equipment was not repaired until it was restored to a condition in which it could perform the functions of supplying water to, and receiving steam from, the CII Carbon boiler, such that the steam could be received by the Kaiser Bayer plant as it had been received prior to the July 1999 explosion.
The testimony at trial established that certain items of the subleased powerhouse equipment were damaged. A boiler feed-water pump and turbine bearings, which were part of the subleased powerhouse equipment, were damaged either as a result of the explosion itself or as a result of the abrupt machinery stoppage or "disorderly shutdown" that occurred in the powerhouse because of the explosion. The trial court found that all of the individual items of the subleased powerhouse equipment were repaired by November 15, 1999. We find no manifest error in this factual determination.
CII Carbon also argues, however, that the repair of the individual items of subleased equipment did not constitute "repair" of the equipment under the terms of the business interruption provisions of the National policy. CII Carbon contends that the "repair" was complete only when the subleased equipment was placed into service in the same configuration as it was in prior to the explosion. The express terms of the National policy's business interruption insurance provisions, however, state that the coverage continues until "such part of the property ... as has been damaged or destroyed" is repaired. (Emphasis added.) The trial testimony established that had the Kaiser Bayer plant been operational, the subleased equipment could have been placed in service as of November 15, 1999. "Such part" of the subleased equipment that had been damaged as a result of the explosion was repaired at that time. The reasons that the equipment was not placed at that time in the same configuration that it was in prior to the explosion were (1) that the Kaiser Bayer plant could not use the steam then, because the Kaiser Bayer plant was not restored to the condition it was in prior to the explosion, i.e., the Kaiser Bayer plant was still damaged, and (2) the needs of the LaRoche plant could be most effectively met by using certain portions of the equipment in the powerhouse in a configuration that did not utilize the subleased equipment in its prior configuration.
In his Reasons for Judgment, the trial court judge relied on the testimony of Steve Bacala, the superintendent of the powerhouse. Mr. Bacala testified that the powerhouse equipment was "fine" and physically capable of processing steam from CII Carbon's coke facility and sending it to the Kaiser Bayer plant as of November 15, 1999, when the powerhouse was partially restarted to serve the needs of the LaRoche plant. He also said that any attempt to send steam to the Kaiser Bayer plant, which was not operational by that date, would create a "terrible, unmanageable situation." The Kaiser Bayer plant had not been repaired sufficiently to accept the steam until more than a year after the November 15, 1999 date. Based on the evidence presented at the trial, the trial court judge concluded that the general business interruption provision of the National policy covered "all business losses from the sale of steam from CII [Carbon] *1067 from the date of the explosion on July 5, 1999 to the partial restart of the powerhouse [on November 15, 1999] to provide steam to LaRoche." We agree with the trial court judge's finding that the subleased powerhouse equipment was "repaired" within the terms of the general business interruption provision of the National policy as of November 15, 1999.

Kaiser Bayer Plant Restoration Date
As we discussed above, the trial court judge and this Court agree that the earliest date that the subleased equipment could supply feed water to, and take steam from, the CII Carbon boiler for use in the operation of the Kaiser Bayer plant was in December of 2000. For the reasons previously discussed, this does not mean that the subleased powerhouse equipment was not "repaired" for purposes of the general business interruption provisions of the National policy.

Assignment of Error: The Trial Court Erred in Finding that CII Carbon's Covered Business Interruption Loss Terminated on November 15, 1999.
CII Carbon argues that although the trial court correctly determined that coverage under the business interruption provisions of the National policy was triggered by the Kaiser Bayer plant explosion in July of 1999, the court erred in applying the provisions of the policy regarding the duration of that coverage. The policy provides that the business interruption coverage continues "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property... as has been damaged or destroyed." Because we have determined that the trial court was correct in finding that the subleased powerhouse equipment that was damaged by the explosion was repaired no later than November 15, 1999, the business interruption coverage ended on that date. This assignment of error is without merit.

Assignment of Error: The Damage to the Kaiser Plant Provides No Basis to Terminate CII Carbon's Business Interruption Coverage.
CII Carbon argues that the damage to the Kaiser Bayer plant triggered coverage under the contingent business interruption endorsement to the National policy and that the damage to the subleased powerhouse equipment triggered coverage under the business interruption provisions of the policy. CII Carbon further argues that it was entitled to both types of coverage from the time of the explosion at the Kaiser Bayer plant until the Kaiser Bayer plant could once again accept steam from CII Carbon.
Because we have found that the subleased powerhouse equipment was "repaired" no later than November 15, 1999, CII Carbon is not entitled to coverage for business interruption losses after that date. The coverage afforded by the business interruption provisions terminated under the express provisions of the National policy at the time that the repairs to the subleased powerhouse equipment were completed.
The trial court determined that the Kaiser Bayer plant was a "recipient property" within the meaning of the contingent business interruption endorsement to the National insurance policy. That endorsement provides that there is coverage for the length of time required to rebuild, repair, or replace the recipient property "which is not operated by the Insured." The loss suffered by CII Carbon after the subleased powerhouse equipment was repaired is exactly the type of loss that contingent business interruption insurance is designed to cover. Damage to the subleased powerhouse equipment was not responsible *1068 for CII Carbon's losses after the equipment was repaired as of November 15, 1999. Instead, the damage to the Kaiser Bayer plant, which was neither owned nor operated by CII Carbon, was responsible for the losses suffered by CII Carbon thereafter. Therefore, we find no error in the trial court judge's determination that only contingent business interruption coverage applied to the losses suffered by CII Carbon when the Bayer plant could not accept steam from CII Carbon. This assignment of error by CII Carbon is without merit.

DECREE
We find no error in the trial court judgment. The judgment is affirmed.
AFFIRMED.

*1069 APPENDIX

NOTES
[1] Business interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to the insured's own property. Contingent business interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to property that the insured does not own, operate, or control.