946 So.2d 249 (2006)
ARMENIA COFFEE CORPORATION
v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY.
No. 2006-CA-0409.
Court of Appeal of Louisiana, Fourth Circuit.
November 21, 2006.
*250 Stanley McDermott, DLA Piper, Rudnick, Gray, Cary US, LLP, New York, NY, and Machale A. Miller, I. Matthew Williamson, Miller & Williamson, L.L.C., New Orleans, LA, for Plaintiff/Appellee.
Christopher E. Carey, Montgomery Barnett Brown Read Hammond & Mintz LLP, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge CHARLES R. JONES, Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD).
EDWIN A. LOMBARD, Judge.
Defendant/Appellant, Great American Insurance Company of New York ("Great American"), appeals from a judgment awarding Plaintiff/Appellee, Armenia Coffee Corporation ("Armenia"), $560,000 on its insurance claim for the value of coffee that Armenia sold and delivered to Ralph C. Richards, Inc. ("Richards") without receiving payment. Following a bench trial, Judge Nadine Ramsey found that fraudulent conduct on the part of Richards' president and purchasing agent induced Armenia to sell the coffee, causing Armenia to sustain an insured loss.
For the reasons below, we REVERSE.
I. BACKGROUND
A. The Parties and Insurance Policy
Armenia is a large coffee importer of green coffee headquartered in New York. Richards, one of Armenia's customers, was a small coffee trading company formerly located in Slidell, Louisiana. At all relevant times, Mark Lemonier ("Mr. Lemonier"), the grandson of the company's founder, was the president of Richards. Mary Bunch ("Ms. Bunch") was a purchasing agent for Richards as well as the owner and operator of several other companies, including Mary G. Bunch Coffee ("MGB"). John Randall ("Mr. Randall") was a coffee trader for Armenia who negotiated the subject coffee sales with Richards.
Armenia procured an all-risks marine "open cargo" policy from American National Fire Insurance Company, Great American's predecessor,[1] bearing the number OMP-7375424 ("the policy"). This policy insured Armenia for physical loss or damage to the coffee while in transit to the United States. Additionally, the policy contained a separate warehouse storage risk provision covering coffee stored in warehouses around the country. The relevant language in the warehouse storage *251 provision states that "the [g]oods and or merchandise covered hereunder are insured against all risks of physical loss or damage from any external cause, irrespective of percentage." The "Ex-Dock Sales" clause in the policy states, ". . . this policy continues to cover the goods and/or merchandise in due course of transit until delivered into store, warehouse or factory of consignee and/or buyer." See Policy OMP-7375424, Clause 43.
B. The Regular Trade Practices Between Armenia and Richards
Armenia stored its imported coffee in various warehouses around the country and sold the coffee to its customers directly from these warehouses. One of Armenia's regular customers was Richards, a decades-old and well-respected trading company that Armenia had dealt with since 1993. Mr. Randall, Armenia's agent, knew Ms. Bunch, Richards' agent, before she began working for Richards, and had conducted sales with her as Richards' agent since 1992.
According to Mr. Randall, in the normal course of business between Armenia and Richards, the parties would first telephonically enter into a sales contract in which they would identify the cargo and agree on the price, terms, and conditions for payment. Within a day or two, Armenia would issue a delivery order to the warehouse instructing it to deliver the designated coffee to Richards' order. Later, Armenia would send an invoice to Richards for the coffee sale. The terms of the invoice called for payment within forty-five days of the issuance of the delivery order. However, if the invoice was sent as "provisional," meaning that it only covered part of the estimated purchase price, Armenia would subsequently send a Price-Fixing Letter establishing the "Final Price" of the goods. That price fixing letter might not be sent until several months after Armenia had issued the delivery order.
C. The Underlying Transactions
Between January and May of 1999, Armenia entered into eight individual purchase and sales agreements with Richards for the subject coffee.[2] Ms. Bunch acted as Richards' purchasing agent in at least some of these sales agreements, and Mr. Randall traded on behalf of Armenia. Shortly after entering into each of the separate agreements, Armenia issued delivery orders authorizing release of the coffee to Richards' order corresponding to each transaction and the coffee was delivered to Richards' order, as intended. As per the terms of the invoice, payment for the coffee relating to the first of the subject sales would have been due in late February or early March, while payment for the last of the eight sales would have been due in the middle of July of 1999.
After purchasing the coffee from Armenia, Richards resold the coffee to MGB, one of Ms. Bunch's companies, at a two-cent mark-up. MGB, in turn, resold the coffee to various other vendors. Within a few months, MGB's credit balance with Richards had risen sharply. By late spring of 1999, MGB had gone bankrupt. MGB never paid Richards for the coffee, and, consequently, Richards did not have the funds to pay its vendors, including Armenia. In the end, Richards also filed for bankruptcy and, ultimately, failed to pay Armenia for the coffee.
D. Armenia's Claim for Lost Coffee and the Instant Suit
In November 1999, after it became clear that Richards was not going to pay for the *252 subject coffee, Armenia made claim against American National under the open cargo policy. Armenia initially claimed that the coffee had been converted by Ms. Bunch and/or mis-delivered to Ms. Bunch by the warehouses. Later, Armenia changed the basis for the claim, alleging instead that the entire purchase and sale transaction, including the ensuing loss of the coffee to Ms. Bunch, was the result of fraud on the part of Ms. Bunch and/or Richards. Armenia specifically claimed that Ms. Bunch, through an elaborate check-kiting scheme, converted the coffee supplied by Armenia and other coffee merchants for her own purposes, and due to Ms. Bunch's actions, Richards was unable to pay its debt to Armenia.
Great American denied Armenia's insurance claim on the basis that Armenia did not sustain an insured loss and had no insurable interest in the coffee. Great American investigated the claim and determined that Richard's failure to pay Armenia for the coffee was nothing more than a credit loss. Armenia subsequently filed suit in July of 2001 seeking to recover from Great American the value of the subject coffee plus attorney's fees, statutory penalties, and judicial interest. Armenia moved for summary judgment on the basis that there was no genuine issue of material fact as to coverage under the policy. Judge DiRosa, substituting for Judge Nadine Ramsey, denied the motion on the basis that Armenia had not shown a fortuitous loss, as is required by the policy. The matter then proceeded to a bench trial before Judge Ramsey.
The trial court concluded that Armenia had lost its coffee due to the fraud perpetrated by Ms. Bunch and Mr. Lemonier, and that the loss of the coffee due to this fraud was an insured loss. Accordingly, trial court ruled that Armenia was entitled to judgment for the insured value of the coffee plus judicial interest. Finding, however, that Great American was not arbitrary or capricious in denying the claim, the court denied Armenia's claim for penalties and attorney's fees.
Armenia filed a motion for new trial, which was granted in part and denied in part. The Amended Judgment changed the entity against whom judgment was entered from American National to Great American and established the date of judicial demand as the date from which judicial interest was to run. Subsequently, Great American filed the instant appeal on the basis that the district court's findings are not supported by the facts and are clearly wrong. Armenia answered the appeal urging that the trial court erred in failing to award penalties and attorneys' fees for Great American's arbitrary and capricious failure to pay the underlying claim.
II. ASSIGNMENTS OF ERROR
In its appeal brief, Great American brings forth legitimate concerns regarding the trial court's findings of fact and identification and analysis of the relevant issues. First, it argues that the trial court erred in identifying the issue in this case as whether Richards' and Ms. Bunch's actions were fraudulent, when the issue should have been whether there was any connection between the check-kiting and the relevant Armenia-Richards' sales transactions. Second, Great American argues that the trial court erred in failing to address the fundamental issue of whether Armenia proved an insured loss. Third, Great American argues that the trial court erred in failing to address the issue of whether Armenia had an insurable interest in the coffee after selling it and delivering it to Richards. Finally, Great American argues that the trial court erred in permitting Armenia's expert to render opinions and *253 offer testimony regarding the credibility of Mr. Lemonier's deposition testimony.
In its Answer to Great American's appeal, Armenia argues that the trial court erred in failing to award penalties and attorney's fees for Great American's arbitrary and capricious failure to pay the claim. It further argues that the court erred in failing to award judicial interest from the date payment on the claim should have been made.
III. APPLICABLE LAW
A. Standard of Review
The interpretation of an insurance policy is normally a question of law. See, e.g., Robinson v. Heard, 01-1697, p. 4 (La.2/26/02), 809 So.2d 943, 945. Where a question of law is presented to this Court, we must determine whether the lower court's interpretive decision is legally correct. CII Carbon, L.L.C. v. National Union Fire Ins. Co. of Louisiana, 05-0071, p. 8 (La.App. 4 Cir. 8/17/2005), 918 So.2d 1060, 1065. In the instant case, however, we find that the issues of whether Armenia suffered an insured loss and whether Armenia possessed an insurable interest in the coffee are mixed questions of law and fact, which are subject to the manifest error standard of review. See Id., citing, Tadlock v. Taylor, 02-0712, p. 17 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 33, writ denied, 03-3265 (La.3/12/04), 869 So.2d 819.
A court of appeal may set aside a trial court's finding of fact where there is manifest error or the finding is clearly wrong. Stobart v. State of Louisiana, 92-1328 (La.4/12/93), 617 So.2d 880, 882. This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding, but must review the record in its entirety to determine whether the finding is clearly wrong. Id.
B. Coverage Under the Policy for the Instant Claim
1. No conflict in the laws of Louisiana and New York
At the outset, we note that despite the fact that the parties discussed the issue of applicable law in their respective motions in support of and in opposition to summary judgment, the trial court applied Louisiana law without analyzing whether New York or Louisiana law applies to the substantive issues of this case. However, the parties agree that the laws of Louisiana and New York are essentially the same in regard to insurable interest. Thus, because there is no "conflict" between the laws of Louisiana and New York and the result would be the same under either state's law, we will give effect to the common policies of both states. See, e.g., Deane v. McGee, 261 La. 686, 260 So.2d 669 (1972).
2. The Trial Court's Manifest Error
We agree with Great American that the trial court's analysis of the issues was erroneous and, as a result, the court reached incorrect legal determinations. In fact, the trial court failed to identify and analyze the threshold issue of the case. This is evident in the written reasons for judgment wherein the trial court judge stated that the issue before the court was "whether Richards' and Ms. Bunch's actions were fraudulent." Then, after making the initial finding that Richards and MGB engaged in check-kiting with regard to their respective banks, the court leapt to the conclusion that the check-kiting between MGB, Richards, and their respective banks, induced Armenia to sell its coffee to Richards resulting in an insured loss. Based on this erroneous analysis, the court *254 found that Armenia was entitled to coverage under the insurance policy.
Because recovery under an insurance policy can only be had where the insured has an insurable interest in the subject of the policy at the time of the insured loss, the pivotal issues in this case are whether Armenia possessed an insured interest in the coffee at the time of the alleged loss and whether Armenia suffered an insured loss, either of which would be dispositive to this claim. The district court's failure to address these issues before determining the existence of coverage for the claim constitutes manifest error. Therefore, we must review the record in its entirety to determine whether the trial court's finding that the policy provides coverage for Armenia's claim was clearly wrong.
3. Insurable Interest
Great American argues that there can be no coverage for Armenia's claim because Armenia did not possess an insurable interest in the coffee after the coffee was sold and delivered to Richards. On the other hand, Armenia argues that it clearly possessed an insurable interest in the coffee at the time of the sales, and because the sales were induced by fraud, the policy provides coverage for this claim.
Under both Louisiana and New York law, the insured must prove that it possessed an insurable interest in the property in order to recover on an insurance policy covering the property.[3]See, e.g., Young v. State Farm Fire & Casualty Ins. Co., 426 So.2d 636, 640 (La.App. 1 Cir.1982), writs denied, 433 So.2d 148, 171 (La.1983), and Scarola v. Insurance Co. of N. Am., 31 N.Y.2d 411, 340 N.Y.S.2d 630, 292 N.E.2d 776 (1972). The insurable interest must exist not only at the time the policy is written but also at the time of the loss. Brown v. State Farm Fire & Casualty Co., 363 So.2d 967, 968 (La.App. 3 Cir.1978). If the loss of the insured property does not expose the insured to either direct, immediate or potential financial loss or liability, the insured is without an insurable interest. See, e.g., Rube v. Pacific Insurance Co. of New York, 131 So.2d 240, 243 (La.App. 1 Cir.1961).
In regard to insurable interest in sold[4] property, the Louisiana Supreme Court stated in Union Cent. Life Insurance Co. v. Harp, 203 La. 806, 14 So.2d 643, 647 (1943),
"A vendor retains an insurable interest in the property sold so long as he has any interest therein, in other words, so *255 long as he would suffer by its destruction, as where he has taken back a mortgage for the purchase price, or where the contract of sale calls for a reconveyance of a lessor estate in the premises by the purchaser to him . . . The interest of the vendor ceases however, where all risk of loss rests with the vendee and no injury will result to the vendor from the destruction of the property."
In regard to transfer of risk of sold goods, the Louisiana Civil Code provides, "[t]he risk of loss of the thing sold owing to a fortuitous event is transferred from the seller to the buyer at the time of delivery." La. Civ.Code Art. 2467. New York law follows the Uniform Commercial Code to determine when risk of loss passes to the buyer. The relevant statute, N.Y. § 38:2-509, states that "where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer (a) upon his receipt of a negotiable document of title covering the goods. . . ."
Great American contends that the sale of the subject coffee was effective, and ownership transferred from Armenia to Richards, when the parties agreed to each transaction at the agreed price, despite the fact that the price had not been paid. Great American further argues that pursuant to either state's law, the risk of loss passed from Armenia to Richards, at the latest, at the time of delivery. Therefore, according to Great American, since Armenia had no mortgage or other security device on the sold coffee, it had no substantial economic interest, and, thus, no insurable interest in the coffee.
The facts in the record support Great American's contentions. Armenia's sales agent, Mr. Randall, testified that after entering into the subject sales agreements with Richards for the coffee, Armenia issued Delivery Orders authorizing release of the coffee to Richards' order corresponding to each transaction. Mr. Randall admitted that the delivery orders entitled Richards to immediate possession of the coffee. Mr. Randall also testified that after selling it, Armenia did not follow the coffee that it sold to Richards and whatever Richards did with the coffee after purchasing it from Armenia was of no interest to Armenia. Thus, the authorized sales and delivery of the coffee to Richards pursuant to Armenia's delivery orders terminated Armenia's insurable interest in the cargo.
Armenia subscribes to a wholly different view. Armenia argues that it did possess an insurable interest in the subject coffee at the time of loss, because the relevant time of loss is the exact moment that the sales were made. Armenia argues that it is illogical that Armenia should lose its insurable interest in the coffee at the very moment it sold the coffee to Richards because the sales themselves were the very instrument of fraud. It further argues that Armenia owned, and certainly, possessed an insurable interest in, the coffee at the time it negotiated the sale of the coffee to Richards.
According to Armenia, the entire purchase-and-sale transaction, and the resulting loss of its coffee to Ms. Bunch, was the result of Ms. Bunch's and/or Richards' fraud, and, since fraud is a covered risk under the policy, there is coverage for this claim.[5] However, in order for this argument *256 to have merit, Armenia would have to show a connection between the alleged fraud that occurred and the subject coffee sales.
Armenia alleges that in order to deceive Armenia and induce it to sell its coffee, Mr. Lemonier and Ms. Bunch engaged in a "systematic scheme to kite checks to falsely inflate their bank balances." Mr. Lemonier's deposition testimony, which was introduced at trial, indicated that Richards intended to pay Armenia for the subject coffee, as it always had in the past, but was unable to do so because MGB did not pay Richards. Mr. Lemonier admitted that he resorted to swapping worthless checks with Ms. Bunch, but stated that he only did so in an effort to pay his vendors for coffee purchased by Richards. Despite the testimony, the trial court concluded that the check-kiting constituted fraud and that "Armenia suffered loss of its goods as a result of this fraud." However, unless there is evidence in the record that the check-kiting between Richards, MGB and their respective banks provided the inducement for, or had anything to do with, the coffee sales then it cannot be said that the coffee sales were induced by fraud and there can be no basis for Armenia's insurance claim.
To provide evidence for its claim of fraud in the sales, Armenia hired Glyn Miller, a forensic accountant, to review the bank records, review Mr. Lemonier's deposition testimony, compile spreadsheets and other documents, and testify at trial about how the money moved through the pertinent accounts. Mr. Miller testified that MGB's credit balance with Richards grew rapidly and sharply during the time that Armenia sold the subject coffee to Richards. Additionally, according to Mr. Miller, Richards' account at Whitney Bank reflected numerous checks from Ms. Bunch drawn on various accounts as well as checks drawn on Richards' account to Ms. Bunch that were not backed by sufficient funds. Mr. Miller testified that the worthless checks were exchanged by Ms. Bunch and Mr. Lemonier during the time period that the relevant coffee sales were made. However, while compelling on the issue of the existence of the check-kiting itself, other than his own opinion, Mr. Miller's testimony did not uncover any evidence that there was any connection between the alleged check-kiting and the sales transactions such that Armenia was induced by the alleged fraud to sell its coffee to Richards.
As the trial court noted, the purpose of check-kiting is to secure credit or the use of funds which do not belong to the drawer of the check, but are funds which are owned by the bank on which the funds are drawn. See, e.g., National Bank of Commerce v. Hughes-Walsh Co., 246 So.2d 872 (La.App. 4 Cir.1971). In check-kiting cases, the party that suffers the loss is the bank or banks upon which the checks are drawn. See Id., and Williams v. United States, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In the instant case, assuming that the exchange of worthless checks between Ms. Bunch and Mr. Lemonier rises to the level of fraud, the victims of the fraudulent check-kiting would be Ms. Bunch's and Richards' respective banks, not Armenia. The trial court, however, expanded the effect of the check-kiting beyond the banks involved, to the unrelated coffee sales.
The trial court grounded its finding of fraud in the coffee sales in its conclusion that the check transactions were "fictitious with the purpose of falsely inflating the bank balances when in fact, there was little or no money." However, nothing in the *257 record indicates that Armenia ever saw, asked for, or had any interest in Richards' bank statements or its financial status. Therefore, Armenia could not have relied on Richards' inflated bank balance because it was never aware of Richards' bank balance.
A review of the record indicates that Armenia was induced to sell the coffee on credit to Richards based on nothing more than Richards' reputation and their long-standing relationship. Richards was a well-respected trading company that had been in existence since the 1940's. Armenia had been selling coffee to Richards for years. Mr. Randall knew Ms. Bunch personally and had traded with her, as Richards' agent, since 1992. Richards had always paid Armenia for the coffee it purchased on credit. Because of their successful business relationship, Armenia allowed Richards leeway in making payment. In the subject coffee sales, just as in the numerous sales the companies had entered into in their decades of prior dealings, Armenia conducted its business with Richards without the benefit of any security interest to protect itself. Thus, it was on its years of successful business dealings with Richards that Armenia reliednot on Richards' bank balance.
Armenia cites two New York cases in its brief to support its argument that it has an insurable interest in the coffee and is entitled to recover for its loss because the subject sales, themselves, were fraudulent. See Great Northern Ins. Co. v. Dayco Corp., 637 F.Supp. 765 (S.D.N.Y.1986) and Farr Man Coffee Inc. & CB & F Interamerica, Inc. v. Chester, 1993 WL 248799 (S.D.N.Y.1993). However, as Great American points out, these cases are distinguishable from the instant case because they involve fraud in the documents of sale. In these cases, because the sales transactions were fictitious, there was no transfer of title, possession, or risk of loss of the goods. In the instant case, the parties are in agreement that none of the documents related to these transactions were forged or otherwise improperly prepared. Therefore, Armenia's reliance on these two cases is misplaced.
Armenia's attempt to establish an insurable interest predicated upon the check-kiting scheme and inflated bank balances is without foundation in the record, as there is no evidence of a connection between the alleged check-kiting and the coffee sales. Armenia did not produce any evidence that the subject coffee sales were induced by fraud. The evidence shows that the transactions between Armenia and Richards for the subject coffee were all intentional, authorized, bona fide sales, which were conducted in the normal course of dealings between the parties. The only thing different about the subject coffee sales as opposed to the prior sales is that Richards ultimately failed to pay Armenia for the subject coffee.
The trial court's finding of coverage for this claim is not supported by the record and is clearly wrong. We find that Armenia possessed no insurable interest in the coffee for purposes of bringing this claim. Since lack of insurable interest is dispositive of Armenia's case, we need not consider Great American's remaining assignments of error.
D. Attorney's Fees and/or Penalties
Armenia appeals the trial court's judgment denying its claim for the damages it allegedly sustained as a consequence of American National's arbitrary and capricious denial of its claim. We need not address the argument on attorney's fees and penalties because they cannot be awarded without a supporting insurance claim. Therefore, we deny Armenia's request *258 for penalties and attorney's fees pursuant to La. R.S. 22:658.

CONCLUSION
Armenia has not proven its case for coverage under the policy. The coffee was not stolen, converted, lost or damaged, but was sold and delivered to Richards, its intended buyer, which thereby terminated Armenia's insurable interest in the coffee. There is no factual basis in the record for the trial court's finding that the coffee was lost due to fraud. Accordingly, the Policy does not provide coverage to Armenia for the instant claim.

DECREE
For the reasons stated above, this Court reverses the judgment of the trial court and finds in favor of American National in regard to Armenia's insurance claim. We further deny Armenia's request for statutory penalties and attorney's fees.
REVERSED.
NOTES
[1] Subsequent to the issuance of the policy, American National changes its name to "Great American Insurance Company of New York."
[2] None of the documents related to these transactions were forged or otherwise improperly prepared.
[3] In Louisiana, the law regarding insurable interest is contained in Louisiana Revised Statute 22:614. It provides:

No contract of insurance on property or of any interest therein or arising therefrom shall be enforceable except for the benefit of persons having an insurable interest in the things insured.
B. "Insurable interest" means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damages.
The New York statute regarding insurable interest, N.Y. § 28:3401, is similar to Louisiana's. It provides,
"No contract or policy of insurance on property made or issued in this state shall be enforceable except for the benefit of some person having insurable interest in the property insured. In this article, `insurable interest' shall include any lawful and substantial economic interest in the safety or preservation of property from loss, destruction, or pecuniary damage."
[4] A "sale" is a contract that requires "the thing, the price and the consent of the parties." La. Civ.Code Art. 2439. "Ownership is transferred between the parties as soon as an agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid." La. Civ.Code Art. 2456.
[5] Fraud is a misrepresentation or suppression of the truth made with the intention to either obtain an unjust advantage for one party or cause a loss or inconvenience to the other. La. Civ.Code. Art. 1953. To prove fraud under Louisiana law, one must show: (1) intent to defraud, and (2) actual or potential loss or damages. Williamson v. Haynes Best Western, 95-1725 (La.App. 4 Cir. 1/29/97), 688 So.2d 1201, 1238