WYNN, Circuit Judge,
dissenting:
On June 3, 2008, a massive explosion at a natural gas production facility on Vara-nus Island, Australia disrupted the availability of natural gas throughout Western Australia. Appellant Millennium’s supply of natural gas ceased later that same day, requiring it to shut down operations at its titanium dioxide production facilities, and resulting in over $10 million in damages. The sole question we must decide is whether the contingent business interruption endorsements of the insurance contracts between Millennium and Appellees National Union and ACE (together, the *287 “Insurers”) require the latter to cover Millennium’s losses.
Although the majority opinion provides a reasonable interpretation of the disputed portions of the insurance policies, the district court articulated an equally reasonable alternate interpretation. Because “no writing is unambiguous if ‘susceptible of two reasonable interpretations[,]’ ” Atalla v. Abdul-Baki, 976 F.2d 189, 192 (4th Cir.1992), I find the policies to be ambiguous. Like the district court, I would thus evaluate the extrinsic evidence for an indication of the parties’ intent in drafting the ambiguous policy provisions. And like the district court, I would find that none of the proffered evidence reveals that intent. It follows that I would affirm the district court’s decision to apply the doctrine of contra 'proferentem to resolve the ambiguity in favor of Millennium and against the Insurers. Accordingly, I must respectfully dissent.
I
A
For the policy year at issue, 2008-09, Millennium obtained insurance coverage through its broker, Marsh. Millennium’s coverage consisted of “master policies” issued by National Union and ACE and local policies issued by Australian companies. The master policies covered Millennium for up to $450 million per occurrence in aggregate losses, with each insurer bearing responsibility for 50% of any covered loss. The disputed provisions are for contingent business interruption (“CBI”) coverage, which is “a relatively recent development in insurance law[.]” Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 168 (2d Cir.2005).
CBI coverage “protects against the loss of prospective earnings because of the interruption of the insured’s business caused by an insured peril to property that the insured does not own, operate, or control.” CII Carbon, L.L.C. v. Nat’l Union Fire Ins. Co. of La., Inc., 918 So.2d 1060, 1061 n. 1 (La.Ct.App.2005). CBI coverage is distinct from “[rjegular business interruption insurance^ which] replaces profits lost as a result of physical damages to the insured’s” own property. Archer Daniels Midland Co. v. Hartford Fire Ins. Co., 243 F.3d 369, 371 (7th Cir.2001).
Endorsement 8 of each of Millennium’s master policies sets forth the CBI coverage. The relevant portion of Endorsement 8 reads as follows:
CONTINGENT BUSINESS INTERRUPTION CONTRIBUTING PROPERTY (IES)
(Not Operated By The Insured)
A. AMOUNT OF INSURANCE:
$(As per declarations) Only against loss directly resulting from necessary interruption of business conducted on premises occupied by the insured, caused by damage to or destruction of any of the real or personal property described below and referred to as CONTRIBUTING PROPERTY(IES) and which is not operated by the Insured, by the peril(s) insured against during the term of this Policy, which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured’s business.
B. SCHEDULE OF LOCATION(S):
The following locations must be direct suppliers of materials to the Insured’s locations or coverage is deemed to be void:

*288
CONTINGENT LOCATION NO. CONTRIBUTING PROPERTY LIMIT OF LIABILITY

DIRECT ONLY AS STATED IN DECLARATIONS[1]
C. COVERAGE:
Subject to all terms, conditions and stipulations of the Policy to which this endorsement is attached, not in conflict herewith, this Policy is extended to cover only against loss directly resulting from necessary interruption of business conducted on premises occupied by the Insured, caused by damage to or destruction of any of the real or personal property described above and referred to as CONTRIBUTING PROPERTY(IES) and which is not operated by the Insured, by the peril(s) insured against during the term of this Policy, which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured’s business.
J.A. 336, 450
The value of the CBI coverage is set forth in the Declarations of the master policies. The coverage limit is $25,000,000 for locations that Millennium has named in the policy, whereas the coverage limit is $10,000,000 for locations that are not named or listed in the policy. The Declarations refer to both named and unnamed locations as “DIRECT CONTRIBUTING OR RECIPIENT PROPERTY(IES).” J.A. 303, 416.
B
The salient facts giving rise to this suit are straightforward and undisputed. At all relevant times, Millennium was in the business of producing titanium dioxide, a white pigment used in a variety of applications including paints and plastics. Millennium operated two interdependent factories near Bunbury, Australia, which relied primarily on natural gas for energy. Like many businesses in Western Australia, Millennium purchased its natural gas from a supplier or an aggregator, rather than directly from a producer. Millennium had a natural gas supply contract with one such entity, Alinta Sales Pty Ltd. (“Alin-ta”).
Alinta obtained the gas that it resold from multiple producers in Western Australia, including Apache Corporation (“Apache”), which supplied at least 20% of the gas that Alinta bought and resold. Pursuant to the agreement between Alinta and Apache, Alinta took title to Apache’s gas when the gas entered a major Western Australian gas transmission line known as the Dampier to Bunbury Natural Gas Pipeline (“Pipeline”). The Pipeline is a government-regulated common carrier owned by third parties who charge pipeline users a fee based on the distance their gas travels. After the gas leaves the Pipeline, it is transported to end users via a network of distribution lines.
Alinta consumes a small amount of the natural gas that it purchases for its own operations. And although it takes title to the gas, it never physically possesses the gas that it sells to its customers because it does not own the transmission or distribu *289 tion facilities.[2] Indeed, because the gas molecules are commingled as soon as they enter the Pipeline, it is impossible to tell either the source or the owner of any given molecule at any given time. Notwithstanding the impossibility of determining the source or the ownership of any particular gas molecule, the title to a specified volume of gas passed from Alinta to Millennium at the inlet point of Millennium’s production facilities.
On June 3, 2008, a massive explosion and fire occurred at Apache’s production facilities on Varanus Island, off the coast of Western Australia. The explosion caused the interruption of 20% to 30% of the natural gas supply in Western Australia. Apache immediately issued a notice of force majeure to Alinta, and Alinta immediately issued the same to Millennium. Shortly thereafter, Millennium notified the Insurers of its claim of lost business income through its broker, Marsh. The parties agree that the damages total $10,850,000, but the Insurers denied Millennium’s claim because “[t]here is no direct supply of gas between [Millennium] and Apache.” J.A. 760.
C
On July 17, 2009, Millennium filed this suit alleging, among other things, declaratory relief, breach of contract, and bad faith. After a lengthy discovery process and the presentation of a “virtual cornucopia of extrinsic evidence,” Millennium Inorganic Chems. v. Nat’l Union, 893 F.Supp.2d 715, 736 (D.Md.2012), the parties submitted cross motions for summary judgment.
In a well-reasoned opinion, the district court analyzed the language of the policies and determined that multiple reasonable interpretations existed for two disputed provisions in Endorsement 8. The district court then analyzed the extrinsic evidence and found that “none of it presents a dispute of material fact for a fact finder to resolve[] because none of the extrinsic evidence sheds light on what the parties’ mutual intent was at the time that the Master Policies were established.” Id. The district court thus applied the doctrine of contra proferentem to resolve the ambiguity in favor of Millennium by holding that “Apache’s natural gas production facility was a ‘direct contributing property’ to Millennium’s Bunbury Operations, ... because Apache’s facility physically provided a direct supply of natural gas to Millennium’s premises, despite the fact that Apache and Millennium had no direct contractual relationship.” Id. at 737. The district court conducted a similar analysis and reached the same conclusion as to the second disputed phrase in Endorsement 8, “for the account of the Insured.” See id. at 737-39.
The district court granted Millennium’s motion for partial summary judgment regarding its declaratory judgment claim and granted the Insurers’ motion for summary judgment regarding Millennium’s bad faith claim. The parties jointly moved for entry of judgment, which the district court granted on January 11, 2013. The Insurers appealed.
II
The parties initially disputed whether New York or New Jersey law governs the *290 interpretation of their insurance contracts. Like the district court, I perceive little difference between the two states’ laws. See Millennium, 893 F.Supp.2d at 728.
In both states: Insurance contracts are to be interpreted according to their “plain and ordinary meaning.” Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 607 A.2d 1255, 1260 (1992). See also Fieldston Prop. Owners Ass’n, Inc. v. Hermitage Ins. Co., Inc., 16 N.Y.3d 257, 920 N.Y.S.2d 763, 945 N.E.2d 1013, 1017 (2011) (“In resolving insurance disputes, we first look to the language of the applicable policies. If the plain language of the policy is determinative, we cannot rewrite the agreement by disregarding that language.”) (citations omitted). But “[i]f the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists.” Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 948 A.2d 1285, 1289 (2008). See Mostow v. State Farm Ins. Cos., 88 N.Y.2d 321, 645 N.Y.S.2d 421, 668 N.E.2d 392, 394 (1996) (“Because the policy may be reasonably interpreted in two conflicting manners, its terms are ambiguous.”).
If a provision is ambiguous, “a court may look to extrinsic evidence as an aid to interpretation.” Chubb, 948 A.2d at 1289. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002) (“Extrinsic evidence of the parties’ intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide.”). Extrinsic evidence is relevant only if it sheds light on the parties’ intent at the time of contracting. Newin Corp. v. Hartford Acc. & Indem. Co., 62 N.Y.2d 916, 479 N.Y.S.2d 3, 467 N.E.2d 887, 889 (1984). And if a determination as to the parties’ intent turns on “the credibility of extrinsic evidence[,]” “such determination is to be made by the jury.” Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907, 909 (1973).
In the absence of clear policy language or relevant extrinsic evidence, courts must rely on additional rules of contract interpretation to apply the terms of an ambiguously worded provision to the facts at hand. “[Coverage provisions are to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured’s reasonable expectations.” Selective Ins. Co. of Am. v. Hudson East Pain Mgmt. Osteopathic Medicine, 210 N.J. 597, 46 A.3d 1272, 1277 (2012). See Westview Assocs. v. Guaranty Nat’l Ins. Co., 95 N.Y.2d 334, 717 N.Y.S.2d 75, 740 N.E.2d 220, 223 (2000) (“If the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.”) (citation omitted). “When an insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it, we will construe the language against the carrier.” Metro. Prop. & Cas. Ins. Co. v. Mancuso, 93 N.Y.2d 487, 693 N.Y.S.2d 81, 715 N.E.2d 107, 112 (1999).
“It has long been the rule that ambiguities in a contractual instrument will be resolved contra proferentem, against the party who prepared or presented it.” 151 West Assocs. v. Printsiples Fabric Corp., 61 N.Y.2d 732, 472 N.Y.S.2d 909, 460 N.E.2d 1344, 1345 (1984). When construing an ambiguous policy, “courts should consider whether more precise language by the insurer, had such language been included in the policy, ‘would have put the matter beyond reasonable question.’ ” Gibson v. Callaghan, 158 N.J. 662, 730 A.2d 1278, 1282 (1999) (quoting Mazzilli v. Acci *291 dent & Cas. Ins. Co., 35 N.J. 1, 170 A.2d 800, 803 (1961)).
In short, these cases convincingly show that there is little difference between the two states’ laws. But to the extent that applicable New York and New Jersey law differ, it is with respect to contra proferen-tem. Whereas New York seems to use the doctrine anytime a contract is not jointly drafted, New Jersey seems to require unequal bargaining power before it will favor an insured. Compare Taylor v. U.S. Cas. Co., 269 N.Y. 360, 199 N.E. 620, 622 (1936) with Chubb, 948 A.2d at 1294 and Pacifico v. Pacifico, 190 N.J. 258, 920 A.2d 73, 78 (2007).
Here, this is a distinction without a difference. Although Millennium is a sophisticated commercial entity and employed a broker to obtain its policies, it did not possess equal bargaining power with the Insurers. Therefore, even under New Jersey law, contra proferentem would still be available. But were it necessary to choose between New York and New Jersey law, I would apply New York law for the same reasons that the district court articulated. Millennium, 893 F.Supp.2d at 727 (conducting a lex loci analysis and determining that New York law would apply because both policies were countersigned by the Insurers in New York).
Ill
A
Turning now to the Insurers’ appeal, summary judgment shall be granted “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). We review the district court’s grant of a motion for summary judgment de novo. See Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir.1995).
Where, as here, the district court considered cross motions for summary judgment, we “must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.” Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir.2003) (quotation marks omitted). In considering each motion, we “resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.” Id. (quotation marks omitted).
B
The majority opinion outlines a reasonable interpretation of the disputed portions of Endorsement 8. For example, the majority opinion provides a dictionary definition of “direct” and concludes that under its chosen definition, “neither Apache nor Apache’s facilities on Yaranus Island can be considered a ‘direct contributing property’ of Millennium.” Ante at 285.
The problem for the majority opinion’s reasoning is that other equally reasonable alternative explanations exist. For example, an alternate definition for “direct” can be found on the same page of the same dictionary as that cited in the majority opinion, yet it supports the conclusion that Apache was indeed a direct contributing property. Specifically, “direct” is also defined as being “from the source or the original without interruption or diversion.” Webster’s Third New International Dictionary 640. As stated by the district court: “Regardless of whether Millennium contracted with Alinta or contracted directly with Apache, the pressurized natural gas still would flow directly from Apache’s facility through the [Pipeline] to Millennium’s Bunbury Operations by operation of ... the law of physics.” Millennium, 893 *292 F.Supp.2d at 735 (quotation marks omitted).[3]
Moreover, no evidence suggests that Alinta has the ability to divert natural gas once it is injected into the Pipeline. In fact, because it does not own any of the transmission or distribution lines through which the natural gas flows, the evidence indicates that Alinta has just as much physical control over the gas as does Apache, which is to say, none. Because the policies do not describe the nature of the direct relationship required for something to be a “direct contributing property,” I find this to be sufficient for Millennium to withstand the Insurers’ motion for summary judgment.
In fact, and as explained by the district court, the language of Endorsement 8 is written in terms of the relationships between physical properties rather than the relationships between people and entities. First, the Endorsement uses the words “CONTRIBUTING PROPERTY(IES) for a subtitle.” Second, Section “B” limits coverage to “locations” that must be direct suppliers. Third, Section “C” covers losses attributable to damage or destruction of “real or personal property ... not operated by the Insured....” All of this “suggests that the physical relationship between the properties is as or more important than the legal relationship between the properties’ owners.” Millennium, 893 F.Supp.2d at 735.
Additionally, the fact that it is impossible to trace any of the gas molecules to Apache is of no import in determining whether a physical relationship existed between Apache and Millennium. If it mattered where each molecule came from or which molecule belonged to whom, Alinta would have no way of knowing that it actually owned any of the gas that it transferred to its customers. The Insurers’ arguments regarding the gas molecules are simply a red herring.
C
To be sure, reasonable alternate interpretations of the contested provisions of Endorsement 8 exist. As I noted above, the majority opinion provides one such reasonable interpretation for each provision. The district court provides a few more. See Millennium, 893 F.Supp.2d at 736. For example, the district court noted that “[i]t is not an unreasonable interpretation of the Master Policies to conclude that, by providing only ‘direct’ CBI coverage, the Insurers sought to limit their exposure to situations in which the insured lacked the kind of influence over a contributing property that comes with contractual privity.” Millennium, 893 F.Supp.2d at 736. But, as with the other reasonable interpretations, “the Master Policies do not say this expresslyt,]” id. and the plain language of the policies cannot resolve the ambiguity. The district court also explained that the “for the account of clause” *293 was ambiguous because the policies fail to name a party who must hold the account, and one could reasonably conclude that either Apache or Alinta could “hold the ‘account of the Insured’ ” to trigger coverage. Id. at 739. The only thing we can conclude from this recitation of competing reasonable interpretations is that the language of the policies is ambiguous. See Atalla, 976 F.2d at 192 (“[N]o writing is unambiguous if susceptible of two reasonable interpretations[.]”) (quotation marks omitted).
I would, therefore, proceed to analyze the extrinsic evidence submitted by the parties. Although the record in this case is nearly 2,200 pages long, I agree with the district court’s conclusion that none of the extrinsic evidence is admissible because none of it provides evidence of the parties’ intent at the time the provisions of Endorsement 8 were drafted. See Millennium, 893 F.Supp.2d at 737, 739.
Because none of the extrinsic evidence is relevant or admissible, there is nothing for a jury to consider, and it is “the responsibility of the court to interpret written instruments.” Wesolowski, 350 N.Y.S.2d 895, 305 N.E.2d at 909 (internal citation omitted). We must, therefore, rely on well-settled rules of contract interpretation to decide the case.
Here, the district court applied the doctrine of contra 'proferentem to construe the ambiguous policies in favor of Millennium and against the Insurers, and it granted Millennium’s motion for partial summary judgment as to its declaratory judgment claim. Millennium, 893 F.Supp.2d at 739. I agree with the district court, and I would, therefore, affirm. For this and the other reasons discussed above, I must respectfully dissent.

. The most significant difference between the National Union and the ACE Endorsements is that the ACE policy contains the phrases "DIRECT ONLY” and "AS STATED IN DECLARATIONS” as shown here. The National Union policy, by contrast, contains nothing in the columns shown above.

. The Insurers seem to dispute Millennium's statement that Alinta never took physical possession of the gas. But they offer no evidence to establish that the gas that they purchased ever made its way into a vessel that was owned or controlled by Alinta. The Insurers merely reassert that Alinta owned the title to the gas after it was injected into the Pipeline, a fact that is neither disputed nor probative of whether Alinta physically possessed the gas.

. The majority opinion takes issue with the definition cited above, noting that it is "the adverbial definition of the term 'direct,' even though the term is clearly used as an adjective in the operative policy phrase, 'direct contributing property.’ " Ante at 285 n. 7. But the issue here is not whether the term "direct” is an adverb that modifies the word "contributing” or an adjective that modifies the term "contributing property.” Nor is the issue a question of which of the over 200 available dictionaries we should selectively choose to find the definition that satisfies our own interpretation of the policies. See, e.g., OED Online, http://www.oed.com/view/Entry/53293? rskey=xO vlbu&result=2&isAdvanced=false (last visited Feb. 06, 2014) (defining the adjectival form of “direct” as “[s]traight, undeviating in course; not circuitous or crooked”) and Oxford Dictionaries Online, http://www. oxforddictionaries.com/us/definition/ american_english/direct?q=direct (last visited Feb. 6, 2014) (defining the adjectival form of "direct” as "extending or moving from one place to another by the shortest way without changing direction or stopping”).