Judge Tiffany G. Chase
Norvel Orazio[1] (hereinafter "Plaintiffs"), seeks review of the April 10, 2017 *747 ruling issued by the Civil Service Commission (hereinafter "Commission"). The ruling granted the New Orleans Police Department's (hereinafter "NOPD") request to create sixteen unclassified police commander positions. After consideration of the record before this Court and the applicable law, we affirm the decision of the Commission.
The facts of this case have previously appeared before this Court and are pertinent to the underlying appeal. In 2010, former NOPD Superintendent Ronal Serpas requested the Commission provide an opinion about a new hybrid position, within the NOPD, which would be comparable to police major and/or police colonel. Orazio, et al. v. City of New Orleans, et al. , 2012-0423 (La.App. 4 Cir. 1/16/13), 108 So.3d 284. The Commission noted that the Civil Service Department had concerns regarding the creation of the position because job specifications were not fully developed and as such, the staff was not able to distinguish between the police colonel, police major and police captain positions. Id. Rather than granting the NOPD's request for the exact position requested, the Commission established an unclassified police commander assignment with a special rate of pay. Employees occupying the rank of lieutenant, captain and major would be eligible for the police commander assignment and would operate at the discretion of the Superintendent of Police.
Plaintiffs disagreed with the Commission granting the assignment and filed a petition with the Commission requesting an investigation into whether the Commission complied with Civ. Ser. R. III § 7.1 when it approved the new police commander assignment. Id. The Commission dismissed the petition and Plaintiffs sought review in this Court. On appeal, this Court found:
[T]he CSC was arbitrary and capricious in denying the entirety of the Plaintiffs' petition without granting an evidentiary and contradictory hearing into the creation of the police commander position given the CSC's legal authority. (internal citations omitted). Therefore, we reverse and remand for proceedings consistent with this opinion.
Id. Although the Commission determined that the police commander title was a "job assignment," the individual taking on the job obtained a new title and new salary. Id. This Court noted that even though the individual in the police commander "job assignment" or "position" would retain their classified status, the "job assignment" or "position" was essentially unclassified given the nature of the employment description. Id. We found questions surrounding the classified or unclassified status of the "job assignment" or "position" existed and warranted an investigation to ensure the integrity of the merit system was maintained. Id.
We issued our decision in Orazio I[2] on January 16, 2013. No significant actions were taken in this matter until Plaintiffs filed a motion for a job study on May 20, 2016. On October 24, 2016, the Commission ordered that the Civil Service Department conduct a job study and investigation into the NOPD's use of the "commanders' special rate of pay" associated with the special assignment of police commander.[3] On November 4, 2016, Plaintiffs *748 petitioned the Commission to suspend the "commanders' special rate of pay" rule and prohibit the current Superintendent, Micheal Harrison (hereinafter "Chief Harrison"), from appointing employees to the police commander assignment until the completion of the job study by the Civil Service Department. The Commission denied Plaintiffs' petition on November 21, 2016, and Plaintiffs filed an application for supervisory writs on December 15, 2016. On March 7, 2017, this Court denied the writ finding no abuse of discretion by the Commission. Norvel Orazio, et al. v. City of New Orleans, et al. , 2016-C-1278.
On February 20, 2017, Chief Harrison formally requested sixteen unclassified police commander positions which would replace the current police commander assignments. Chief Harrison described the internal issues surrounding the command and control of subordinates which existed with the current police commander assignments. He attributed those issues to the manner in which the assignment was originally created. Chief Harrison stated that the unclassified positions would put the NOPD closer in line with other City Departments regarding the ratio of classified employees to unclassified manager.[4] The requested position would replace the current commander assignment. Also, the job authority and autonomy would be expanded for the requested position. The new expansive police commander position would oversee all personnel who are majors and below, have wide autonomy and authority to draft policies, hire personnel, manage divisional budgets, implement reform projects and participate in policy making efforts. Chief Harrison explained that the positions are not appropriate for classified service because the police commanders must be able to effectively represent the department and the superintendent independently. The Commission did not rule on Chief Harrison's request at this meeting.
On April 3, 2017, the Civil Service Department's job study and investigation was presented to the Commission. The report concluded that the police commander position did not satisfy the requirements for unclassified status. According to the job study, the position could be performed by a classified employee and did not establish that the commanders would operate with policy-making autonomy. The NOPD responded to the job study and noted that the current police commander assignment is a classified position and, as such, does not allow for policy-making autonomy. The NOPD advised that it intended to delegate the necessary policy-making autonomy, as required by Civ. Ser. R. III § 7.1, to the new position.
On April 10, 2017, the Commission held a special meeting to consider Chief Harrison's February 20, 2017 request for sixteen unclassified police commander positions. Chief Harrison specified at this meeting that the basis for his request was to ensure that the police commander position would be able to make recommendations and create and execute policy and initiatives without micromanagement from himself or the deputy chief. Additionally, Chief Harrison stated that the current police commander assignment is within the classified service since the employees appointed *749 to the commander assignment retain their classified status.[5] He further stated that as the Superintendent, when a classified police commander fails to adequately perform the required job tasks, the Superintendent is precluded from immediately replacing the individual because of their classified status. Chief Harrison requested the new positions be categorized as unclassified to enable him to take the necessary steps to immediately rectify an employment situation and not have to operate through the civil service system.
At the meeting, the Commission elected to add an executive session to its agenda to discuss the impact the NOPD's request had on the decision issued from this Court in Orazio I . After concluding the executive session, the Commission approved the NOPD's request for the sixteen unclassified positions. This ruling is memorialized in a minute entry from the Commission dated and signed June 26, 2017, which provides:
This matter came before the Commission on April 10, 2017. After entertaining public comment, the Commission unanimously GRANTED the Police Department's request to create 16 Unclassified Police Commander Positions pursuant to Rule III, Section 7.1(a)-(c). The Commission further directed the Civil Service Department to complete the audit of the 16 Unclassified Commander Positions required by Rule III, Section 7.1(c) by April 30, 2018.
The Commission also noted that since an audit was required, if the Commission finds that the position no longer complies with Civ. Ser. R. III, § 7.1, it could retract the unclassified status of the police commander position.[6] In any event, the Commission found that the NOPD had provided sufficient evidence to demonstrate that the police commander position would have policy-making autonomy and that the positions would include a fair hiring process for all applicants. This appeal followed.[7]
Standard of review
This Court has previously determined that decisions by the Commission involving questions of fact and law are reviewed under a manifest error/clearly erroneous standard of review.
In Banks v. New Orleans Police Dep't., 2001-0859, p. 3 (La.App. 4 Cir. 9/25/02), 829 So.2d 511, 513-14, we articulated the standard of review in civil service cases. First, the review by appellate courts of the factual findings in a civil service case is governed by the manifest error or clearly erroneous standard. Second, when the Commission's decision involves jurisdiction, procedure, and interpretation of laws or regulations, judicial review is not limited to the arbitrary, capricious, or abuse of discretion standard. Instead, on legal issues, appellate courts give no special weight to the findings of the trial court, but exercise their constitutional duty to review questions of law and render judgment on the record. A *750 legal error occurs when a trial court applies the incorrect principles of law and such errors are prejudicial. Finally, a mixed question of fact and law should be accorded great deference by appellate courts under the manifest error standard of review. See Stern v. New Orleans City Planning Comm'n, 2003-0817, pp. 5-6 (La.App. 4 Cir. 9/17/03), 859 So.2d 696, 699-700.
Russell v. Mosquito Control Bd. , 2006-0346, pp. 7-8 (La.App. 4 Cir. 9/27/06), 941 So.2d 634, 639-640.
The issue of whether the Commission's actions at the April 10, 2017 meeting exceeded its authority presents an interpretation of fact and law and is thus subject to a manifest error/clearly erroneous standard of review. The manifest error standard dictates that a reviewing court must do more than review the record for evidence that supports or negates the trial court's finding, but must also review the record in its entirety to determine whether the finding is clearly wrong. Armenia Coffee Corp. v. Am. Nat. Fire Ins. Co. , 2006-0409, p. 7 (La.App. 4 Cir. 11/21/06), 946 So.2d 249, 253, writ denied , 2006-2983 (La. 2/16/07), 949 So.2d 422 (citing Stobart v. State through Dep't of Transp. & Dev. , 617 So.2d 880 (La. 1993) ).
Open meetings law
Plaintiffs argue that the Commission violated the open meetings law, on April 10, 2017, by entering executive session to discuss Chief Harrison's request and surrounding litigation without notice. Plaintiffs further contend that the Commission violated the law by placing the executive session on the special meeting agenda at that moment. The Commission maintains the executive session was added to the agenda by a unanimous vote and after public comment and/or objection was sought and was therefore proper.[8] Moreover, the Commission submits that it discussed this Court's opinion in Orazio I in the session; thus, they were in compliance with the open meetings law.
La. R.S. 42:14(A) provides that "Every meeting of any public body shall be open to the public unless closed pursuant to R.S. 42:16, 17, or 18." La. R.S. 42:16 dictates the rules for entering into an executive session and provides that:
A public body may hold executive sessions upon an affirmative vote, taken at an open meeting for which notice has been given pursuant to R.S. 42:19, of two-thirds of its constituent members present. An executive session shall be limited to matters allowed to be exempted from discussion at open meetings by R.S. 42:17 ; however, no final or binding action shall be taken during an executive session. The vote of each member on the question of holding such an executive session and the reason for holding such an executive session shall be recorded and entered into the minutes of the meeting. Nothing in this Section or R.S. 42:17 shall be construed to require that any meeting be closed to the public, nor shall any executive session be used as a subterfuge to defeat the purposes of this Chapter.
La. R.S. 42:17 provides a list for when a public body may hold an executive session, one of which is to discuss litigation issues.[9] La. R.S. 42:18 is not pertinent to the case sub judice as it relates to executive sessions of legislative houses and committees.
A review of the record from the April 10, 2017 meeting reflects that the executive session was added after hearing *751 numerous comments regarding the addition of the police commander positions. The Commission specifically stated that it sought to add the executive session to the agenda in order to discuss Orazio I and its impact to the NOPD's request for the unclassified positions. The Commission unanimously approved adding the executive session to the agenda. After concern was voiced regarding moving into executive session, the Commission unanimously agreed to do so noting that it was permitted to enter executive session by adding the session to the agenda.
A public body may enter into an executive session to discuss strategy or negotiations with respect to litigation when an open meeting would have a detrimental effect on the litigating position of the public body. La. R.S. 42:17(A)(2). Commissioner Tania Tetlow stated that the Commission was entering into executive session to discuss the surrounding litigation of Orazio I . The Commission continued to hear from those present at the meeting regarding the unclassified positions level of autonomy prior to entering into executive session and specified that it was entering executive session to discuss Orazio I and its potential impact. As the statute specifically provides for such actions, we find that the Commission's actions of entering into executive session did not violate the open meetings law.
Constitutionality of the Commission's actions
While Plaintiffs allege numerous assignments of error, regarding the unclassified positions, we find the central issue to be whether the Commission acted within its authority to approve the sixteen unclassified positions requested by the NOPD. Specifically, Plaintiffs challenge the Commission's actions by arguing that the approval of the unclassified positions of police commander violates the Louisiana Constitution and Civil Service Rules. Plaintiffs contend that the Commission exceeded its authority by approving the sixteen unclassified police commander positions at the April 10, 2017 meeting.
La. Const. Ann. art. X provides rules and regulations regarding the civil service system. The positions that are categorized as unclassified, at the state and city level, are enumerated in the relevant constitutional provision. Those positions not included in the unclassified service list are in the category of classified service. La. Const. Ann. art. X § 2 (A). The article further provides that "Additional positions may be added to the unclassified service and those positions may be revoked by rules adopted by a commission." La. Const. Ann. art. X § 2 (B). While this is a "catch all" phrase, the Commission submits that it is authorized to add and revoke unclassified service positions based on this constitutional provision and Civ. Ser. R. III § 7.1.
Civ. Ser. R. III, § 7.1 provides,
At its discretion, the City Civil Service Commission may add additional positions to the unclassified service, if:
(a) after a thorough review and analysis of the duties and responsibilities of the position, the Commission has determined that they neither are appropriate for, nor should they be performed by, a classified employee and,
(b) the position is essentially of a sensitive nature, having considerable discretion and policy-making authority, which is not subject to further review or modification and,
(c) the position is audited on a regular basis by the Civil Service Department to determine the continuing appropriateness of the unclassified status.
*752 Plaintiffs further argue that the police commander position violates Civ. Ser. R. III, § 7.1 because the position can be performed by a classified employee and the position's responsibilities do not allow for policy-making authority, not subject to further review.
La. Const. Ann. art. X and Civ. Ser. R. III, § 7.1, when reviewed in pari materia , authorize the Commission to create additional unclassified positions. The Commission's constitutional authority is derived from La. Const. Ann. art. X § 2 which also allows the Commission to add its own rules regarding adding and revoking unclassified positions. The Commission's ability to add unclassified positions further rests within its discretionary authority granted by Civ. Ser. R. III § 7.1. After receiving Chief Harrison's request for the sixteen unclassified positions, the Commission held a meeting and heard from various individuals concerning their position on the additional positions. The Commission also received a job study from the Civil Service Department containing its findings regarding the police commander position being defined as unclassified. At the conclusion of the meeting, the Commission unanimously voted to approve the additional police commander positions and categorize the positions as unclassified.
The constitution affords the Commission great discretionary power. While we may review the evidence and reach a different conclusion, the law does not permit us to substitute our interpretation for that of the Commission. Taking into consideration everything presented to the Commission at the meeting, the Commission determined that the police commander position was not appropriate to be performed by a classified employee. The Commission found that the NOPD adequately demonstrated its intent to allocate the necessary policy-making authority to the position and that the Commission would conduct an audit of the position on a regular basis to determine the continued appropriateness of the unclassified status. The Commission maintains that its decision to approve the positions was partly based on the NOPD's intent to further delegate the necessary policy-making authority required by Civ. Ser. R. III, § 7.1 and since the unclassified position does not currently exist, it must rely on the representations made by the NOPD of how it plans to implement the position. Additionally, the Commission determined that after the audit is completed if it determines that the positions no longer meet the prerequisites for unclassified service, it has the authority to revoke the status of the police commander positions. This authority resides in Civ. Serv. R. III, § 7.2, which provides, in pertinent part, that "The Commission may revoke a position previously allocated to the unclassified service if: (a) the Commission determines that the position no longer meets the prerequisites for continuing in the unclassified service...." We cannot conclude that the Commission's actions at the April 10, 2017 meeting were manifestly erroneous as the action to add unclassified positions aligns with its authority afforded by the constitution and the civil service rules.
Conclusion
For the foregoing reasons, we find that the Commission's actions were within its constitutional and discretionary authority when it approved the sixteen unclassified police commander positions. Accordingly, the Commission's ruling of April 10, 2017 is affirmed.
AFFIRMED
LOBRANO, J., CONCURS IN THE RESULT

The named Plaintiffs in this matter include: Norvel Orazio, Michael Glasser, Harry Mendoza, Rose Duryea, Frederick Morton, Jerome Laviolette, Raymond C. Burkhart, Jr., James Scott, Joseph Waguespack, Heather Kouts, William Ceravolo, Simon Hargrove and Bruce Adams.

Hereinafter, Orazio, et al. v. City of New Orleans, et al. , 2012-0423 (La.App. 4 Cir. 1/16/13), 108 So.3d 284, shall be referred to as Orazio I .

At the April 10, 2017 meeting, Robert Hagmann, Personnel Administrator, testified that the purpose of the report was to provide the Civil Service Department's results of the investigation of the NOPD's use of a special rate of pay granted to recognize the special assignment of police commander and exam the appropriateness of the police commander position for unclassified service.

Currently, the NOPD has a ratio of 233 to 1 of classified employees to unclassified manager. Other departments have ratios closer to 30 or 40 to 1. The NOPD's request would put its ratio at 64 to 1.

As opposed to the new position which would be unclassified.

During oral arguments it was indicated that the audit report was due in May 2018 and that if the audit found that the police commander position no longer qualified for unclassified service, the Commission had the authority to revoke the unclassified status of the position.

On June 26, 2017 Plaintiffs filed a notice of intent to apply for supervisory writs which was granted by this Court, on August 7, 2017, for the sole purpose of remanding the matter to the Commission to consider Plaintiffs' notice of intent as a notice of appeal. Plaintiffs also filed a petition for appeal on August 17, 2017. The order was signed on September 25, 2017, denying Plaintiffs' request for suspensive appeal but, granting a devolutive appeal.

No objections nor public comments were received.

The other items enumerated in La. R.S. 42:17 are not pertinent to the matter at issue.