Judge Rosemary Ledet
This is the third appeal in this civil service case. The factual and procedural background of this case is set forth in this court's two prior opinions- Orazio v. City of New Orleans , 12-0423 (La. App. 4 Cir. 1/16/13), 108 So.3d 284 (" Orazio 1 "); and Orazio v. Dep't of Police , 17-1035 (La. App. 4 Cir. 5/23/18), 248 So.3d 745 ("
*342 Orazio 2 "). In this third appeal,[1] the plaintiffs-Norvel Orazio; Michael Glasser; Harry Mendoza; Rose Duryea; Frederick Morton; Jerome Laviolette; Raymond C. Burkart, Jr.; James Scott; Joseph Waguespack; Heather Kouts; William Ceravolo; Simon Hargrove; and Bruce Adams (collectively "Plaintiffs")-seek review of the following three rulings by the Civil Service Commission for the City of New Orleans (the "Commission"):
• An August 21, 2018 ruling approving the continuation of sixteen unclassified Commander positions in the New Orleans Police Department ("NOPD");[2]
• An August 27, 2018 ruling denying the demand for an examination for a classified Major position filed by the Police Association of New Orleans ("PANO") and three Captains, two of whom are Plaintiffs-Mr. Glasser and Mr. Waguespack; and
• A September 20, 2018 ruling denying Plaintiffs' motion for a status conference and an evidentiary hearing, stating that the matter was disposed of in Orazio 2 .[3]
For the reasons that follow, we reverse the Commission's ruling approving the continuation of the sixteen unclassified Commander positions in the NOPD and affirm the Commission's other two rulings.
FACTUAL BACKGROUND
The thrust of the instant appeal is the appropriate classification of sixteen NOPD Commander positions-unclassified, as the NOPD's Superintendent requested and the Commission approved and reapproved; or classified, as the Plaintiffs contend. To place the issue in context requires a review of the development of the NOPD Commander position, including the three iterations of that position-(i) Colonel (classified); (ii) special rate of pay assignment (classified); and (iii) Commander (unclassified).
Colonel (Classified)
The first iteration was a request by then-Superintendent Ronal Serpas for a hybrid job position to be labeled "Colonel." Superintendent Serpas made this request in a letter, dated October 27, 2010, to the Civil Service Department's Director, Lisa Hudson. Superintendent Serpas acknowledged in his letter that his proposed Colonel *343 position was similar to the existing classified position of Major.[4]
The Civil Service Department ("CSD") expressed concerns regarding the creation of the Colonel position because it was unable to distinguish between the proposed Colonel position and the existing Major and Captain positions. Ultimately, the Superintendent's request for a Colonel position was not approved.
Special Rate of Pay Assignment (Classified)
The second iteration was a special rate of pay assignment, for which the NOPD created the working title of "Police Commander." In 2011, the Commission approved creating the special rate of pay assignment in lieu of the requested Colonel position. The special rate of pay assignment was, in essence, a temporary, special job assignment accompanied with a special rate of pay. These assignments were made at the Superintendent's discretion; the persons discharging the assignments were classified employees.
Commander (Unclassified)
The third, and final, iteration was an unclassified Commander position. In February 2017, then-Superintendent Harrison requested that the Commission approve sixteen unclassified Commander positions to replace the current special rate of pay assignments. The Commission approved this request in 2017 and reapproved it in 2018.
PROCEDURAL BACKGROUND
Challenging the Commission's approval of the special rate of pay assignment, Plaintiffs commenced this civil service case in July 2011. In their petition, Plaintiffs alleged that the special rate of pay assignment was a guise for the creation of an unclassified position. The gist of Plaintiffs' allegations was that the special rate of pay assignment deprived them of promotional opportunities and violated civil service principles. In their Petition, Plaintiffs requested the following relief:
• A Civil Service Commission Rule III, § 7 investigation into the police Commander position and an evidentiary and contradictory hearing before a Civil Service Commission hearing officer;
• An audit of the Commander position and funding;
• The administration of a Major's examination to qualified employees; and
• The revocation, annulment, and dissolution of the Commander appointed position via the special rate of pay.
*344 The Commission dismissed Plaintiffs' petition. Plaintiffs appealed.
This court, in Orazio 1 , framed the issue presented as "whether the [Commission] was arbitrary and capricious when it denied the Plaintiffs an investigation and contradictory hearing relative to the creation of the police commander position." 12-0423, pp. 3-4, 108 So.3d at 287. We cited La. R.S. 33:2397(4)[5] and Civil Service Rule III, § 7.3[6] as providing the authority for the Commission to conduct an investigation and to hold an evidentiary hearing. We reasoned that an investigation coupled with an evidentiary hearing regarding the creation of the Commander position was required, observing that "[t]he record before us connotes the questionability of the classified or unclassified nature of the 'job assignment' or 'position' " and that "[a]n investigation would ensure ... 'the integrity of the merit system' and protect an 'equitable relationship between positions in the classified and unclassified services.' " Id. , 12-0423, p. 5, 108 So.3d at 287-88 (quoting Civil Service Rule III, § 7.3).
On remand, the Commission scheduled an evidentiary hearing before a Hearing Examiner and ordered the CSD to conduct a job study and to investigate the NOPD's use of the commander special rate of pay rule associated with the special assignment of Commander.[7]
Before the job study could be completed and the hearing held, then-Superintendent Harrison requested that the Commission approve sixteen unclassified Commander positions to replace the current special rate of pay assignments. In response, the CSD added to the scope of its job study, which was being conducted, the Superintendent's request for the creation of sixteen unclassified Commander positions.
In April 2017, the results of the CSD's job study were presented to the Commission. At the meeting, the Commission added an executive session to its agenda to discuss the impact of the NOPD's request to create sixteen unclassified Commander positions on this court's remand order in Orazio 1 . After concluding the executive session, the Commission approved the NOPD's request for the creation of sixteen unclassified Commander positions.[8] Plaintiffs appealed.
*345 This court, in Orazio 2 , observed that although Plaintiffs raised multiple issues, the principal issue was whether the Commission's action of approving the creation of sixteen unclassified Commander positions exceed its constitutional and statutory authority. We observed that the Constitution authorizes the Commission to adopt its own rules regarding the adding and revoking of unclassified positions and that the statutory provisions grant the Commission discretionary authority. Affirming the Commission's ruling, we reasoned that the constitutional and statutory provisions, read together, authorize the Commission to create additional unclassified positions. We concluded that the Commission's action "align[ed] with its authority afforded by the constitution and the civil service rules" and affirmed. Orazio 2 , 17-1035, p. 12, 248 So.3d at 752.
Following our decision in Orazio 2 , the results of the 2018 Audit were presented at the August 21, 2018 special meeting. After entertaining comment, the Commission approved the reauthorization of the sixteen unclassified Commander positions by a 4-to-1 vote.[9] This appeal followed.
STANDARD OF REVIEW
An appellate court reviews factual findings in a civil service case under the manifest error or clearly erroneous standard of review. Russell v. Mosquito Control Bd., 06-0346, p. 7 (La. App. 4 Cir. 9/27/06), 941 So.2d 634, 639 (citing Banks v. New Orleans Police Dep't , 01-0859, p. 3 (La. App. 4 Cir. 9/25/02), 829 So.2d 511, 513-14 ). An appellate court accords great deference to mixed questions of fact and law. Banks , p. 3, 829 So.2d at 514. The issue of whether the Commission's actions exceed its authority presents an interpretation of fact and law governed by the manifest error or clearly erroneous standard of review. Orazio 2 , 17-1035, pp. 6-7, 248 So.3d at 750. "[W]hen the Commission's decision involves legal issues such as jurisdiction, procedure, and interpretation of laws or regulations, 'appellate courts give no special weight to the findings of the trial court, but exercise their constitutional duty to review questions of law and render judgment on the record.' " Achord v. Dep't of Fire , 18-0635, pp. 4-5 (La. App. 4 Cir. 12/27/18), --- So.3d ----, ----, 2018 WL 6815069, *2 (quoting Russell , supra ).
DISCUSSION
Although Plaintiffs raise multiple assignments of error, the dispositive issue is whether the Commission erred in approving the continuation of sixteen unclassified Commander positions in the NOPD. Before reaching this issue, we address the Commission's other two rulings before us-the denial of the requests for the following: (i) an evidentiary hearing and (ii) a Major's examination.
Evidentiary Hearing
In July 2018, following our decision in Orazio 2 and before the Commission's reauthorization in August 2018 of the Commander position, Plaintiffs filed a motion *346 for an evidentiary hearing styled: "Motion for Status Conference for a Trial before the Hearing Officer." In the Motion, Plaintiffs averred that the purpose of the status conference was to set cutoff dates and that the last status conference was held on October 24, 2016-the same date the job study was ordered. Plaintiffs further averred that "[s]ince the last status conference two audits were conducted by the civil service staff that did not support the Commanders Position as either a special rate of pay or as an unclassified position."
After the special meeting, in September 2018, the Commission denied Plaintiffs' motion, reasoning that the matter was moot because it was disposed of in Orazio 2 . In so finding, the Commission issued the following written reasons:
This matter has been disposed of by a decision of the Louisiana Court of Appeal for the Fourth Circuit affirming the Commission's decision to create sixteen unclassified Police Commander positions. [ Orazio 2 , supra . ] The Commission observes that this issue, Appellants' request for an evidentiary hearing, was before the Fourth Circuit through Appellants' assignment of error alleging that the Commission had violated Appellants' due process rights by taking action without an evidentiary hearing. The Commission opposed this assignment and observed that the Appellants themselves acknowledged that the Commission's creation of an unclassified position of Police Commander rendered the Fourth Circuit's earlier order to conduct a contradictory and evidentiary hearing moot. In its brief to the Fourth Circuit, the Commission agreed that its approval of the unclassified Police Commander positions rendered moot the Order for an evidentiary and contradictory hearing. This is well-trod ground. Had the Fourth Circuit desired to order further hearings on this matter, it had ample opportunity. Clearly, the Fourth Circuit agreed with the Parties that a hearing at the Commission level was moot.
On appeal, Plaintiffs contend that this court's remand order in Orazio 1 is not moot and that "Appellees' position a business meeting is equivalent to an evidentiary and contradictory hearing ordered by the court is ludicrous." The NOPD counters that Plaintiffs' improperly are attempting to revive the 2013 remand order for an evidentiary hearing on the creation of the special duty assignment of Commander. The NOPD contends that the Commission correctly concluded that this issue was disposed of when this court in Orazio 2 affirmed the Commission's decision to create the unclassified Commander positions. The NOPD further contends that this issue regarding an evidentiary hearing was thoroughly addressed and dismissed by this court in Orazio 2 .
The Commission contends that "[n]othing has changed since the Commission's September 20, 2018 Order denying Appellant's request for an evidentiary hearing and now that creates the need for such a hearing." We agree. Although this court does not agree the matter is moot,[10] we find it would serve no useful purpose, at this juncture, to remand this matter for *347 an evidentiary hearing. The record before us contains the results of the 2018 Audit, the NOPD's written response thereto, and the official minutes from the Commission's August 21, 2018 meeting. For this reason, we affirm the Commission's ruling denying an evidentiary hearing.
Police Major Examination
The minutes from the Commission's August 27, 2018 meeting reflect that "Item #4(b) was a request from the Police Association of New Orleans (PANO) for an examination for the classified position of Major."[11] At the meeting, it was noted that NOPD's position is that it did not need the Major's examination "because Commanders are doing the work of the Captains and Majors." Likewise, the CSD's Director, Ms. Hudson, stated that there is no need for a Major's examination because the classification is not being used. In denying the request for a Major's examination, the Commission declared that "there should be discussions in the future on looking at whether or not it is appropriate." We cannot say that the Commission's decision was erroneous.
Legality of the Unclassified Commander Positions
As noted at the outset, the principal issue presented here is the legality of the unclassified Commander positions. The gist of Plaintiffs' position is that the unclassified Commander positions were created to circumvent the civil service system. It is well-settled that the civil service system is "designed to protect career public employees from political discrimination by eliminating the 'spoils' system." Mathieu v. New Orleans Pub. Library , 09-2746, p. 4 (La. 10/19/10), 50 So.3d 1259, 1262 (citing Bannister v. Dep't of Streets , 95-0404, p. 4 (La. 1/16/96), 666 So.2d 641, 645 ). Stated otherwise, "[t]he purpose of the civil service system is to do away with promotions resulting from personal relationships and replace it with promotions resulting from the objective criteria of examination, years of service, and education level." Maurice v. Dep't of Police , 94-2368, p. 7 (La. App. 4 Cir. 6/7/95), 657 So.2d 501, 505. Under the civil service system, " 'non-policy forming' public employees are selected on the basis of merit and can be discharged only for insubordination, incompetency, or improper conduct." Mathieu , supra (citing Bannister , 95-0404 at pp. 4-5, 666 So.2d at 645 ).
The Louisiana Constitution provides that "[t]he state and city civil service is divided into the unclassified and the classified service. Persons not included in the unclassified service are in the classified service." LA. CONST . art. X, § 2 (A). Thus, there are only two types of job classifications-classified and unclassified. The Louisiana Constitution enumerates those positions included in the unclassified service and provides the following catchall provision: "[a]dditional positions may be added to the unclassified service and those positions may be revoked by rules adopted by a commission." LA. CONST. art. X, § 2 (B);[12] see also La. R.S. 33:2401.
*348 The Louisiana Supreme Court has cautioned that "[u]nless the courts protect civil servants in their legislative rights, the civil service system of employment could easily be reduced to a mockery." State ex rel. Murtagh v. Dep't of City Civil Serv ., 215 La. 1007, 1024, 42 So.2d 65, 70 (1949). To preserve the Civil Service system, exceptions to the classified service are narrowly construed. Id.[13]
The dispositive issue here is whether the sixteen Commander positions satisfy the requirements for unclassified status set forth in Civil Service Rule III, § 7.1, which was enacted pursuant to the constitutional catch-all phrase in LA. CONST. art. X, § 2 (B).
To provide a factual background for addressing this issue, it is necessary to review the evidence in the record. As noted elsewhere in this opinion, the record contains the results of the 2018 Audit, the NOPD's written response thereto, and the official minutes from the Commission's August 21, 2018 meeting.
At the meeting, Robert Hagmann, Personnel Administrator over the Classification and Compensation Division, explained that the purpose of the 2018 Audit was to determine if the sixteen unclassified Commander positions met the criteria of Civil Service Rule III, § 7.1. He further explained the methodology the CSD used in conducting the 2018 Audit included interviewing the sixteen Commanders and reviewing the selection process used for the June 2018 appointments to the position.
The 2018 Audit results were as follows:
• Assigned duties of responsibilities of the 16 Police Commander positions are appropriate for and should be performed by positions in the classified service and as such the unclassified Police Commander position is not in keeping with Rule III, Section 7.1(a) relative to adding additional unclassified position.
• The Police Commander positions have a role in recommending policy but it is subject to further review and modification and as such is not in keeping with Rule III, Section 7.1(b) which requires that the position have policy-making authority which is not subject to further review or modification.
• The Police Commander positions exercise discretion but their discretion is within strict guidelines as directed *349 by NOPD's Standard Operating Procedures, departmental policies and the Federal Consent Decree and as such is not in keeping with Rule III, Section 7.1(b), which requires having considerable discretion.
• The selection process for Police Commander lacks objectivity and uniformity required of a fair and transparent appointment process.[14]
Summarizing, Mr. Hagmann stated that the audit results reflected that "no additional policy making has been assigned, policy making authority continues to be subject to two further levels of review."
Conversely, the NOPD, in its written opposition to the 2018 Audit, voiced the following areas of disagreement with the 2018 Audit results:
• The fact that Police Captains performed these duties in the past and the fact that the Captain's job description (which has not been updated since 2000) includes the responsibilities now assigned to Commanders as authorized by the Civil Service Commission, does not deem an automatic interpretation that the duties are appropriate for the classified service.
• Policing the modern era requires innovation and on-the-ground policy creation and management on a day-to-day basis by Command Staff which includes our Commanders.
• The NOPD does not agree with the staff's definition [of] what constitutes policy-making or the level of discretion granted to the Commanders. Numerous examples of [the] discretion and policy making [granted to Commanders] were provided to Civil Service staff, however, the staff has chosen to characterize such work as not applicable due to their overly restrictive definition of what is "subject to review," what constitutes "policy-making," or what is considered "discretion."
• The NOPD stands by its recently created process for selecting Commanders, which for an unclassified appointment, was entirely voluntary and represents one of the most robust processes ever created for selection of an unclassified appointment in the entire City.
The NOPD summarized its opposition as follows:
In 2017, the Civil Service Commission recognized the need for NOPD to have flexibility, and to quickly take action to rotate, reassign, or remove personnel to act as Commanders based on the discretion of the Superintendent in consultation with his Deputy Superintendents. The most appropriate method to achieve that end is to maintain the current structure of unclassified Commanders that has already been approved.
Echoing the written opposition, then-Superintendent Harrison stated that he needed flexibility because "he need[ed] timely decisions to be able to manage just like in corporate America."[15] Eric Melancon, NOPD's Deputy Chief of Staff likewise stated that the Superintendent could hold Commanders more accountable if they are at-will, unclassified employees.
At the meeting, the Commission was also presented with the objections of several *350 police representative groups-PANO, the Fraternal Order of Police, and the Black Organization of Police-to the unclassified Commander positions. The gist of the police organizations' objections was that reapproving the unclassified Commander positions would undermine the merit-based civil service system.
Despite the police organizations' objections and the CSD staff's recommendation against reapproving the positions, the Commission voted, with one dissent, to reapprove the positions. Voting against the reauthorization of the unclassified Commander positions, Commissioner Moore expressed his opinion that the tradeoffs did not merit "the sacrifice of the structure of civil service" and posed the question of "where do we stop, will it be Lieutenants next?"
Based on our review of the record, we find the Commission's decision to reapprove the unclassified Commander positions is neither legally nor factually supported. Contrary to the Commission's contention, this appeal does not present the same legal issue that we addressed in Orazio 2 . Our decision in Orazio 2 was based on the theoretical, rather than the actual, policy-making responsibilities allocated to the Commander positions.
In Orazio 2 , we addressed the issue of whether, relying on the representations made by the NOPD regarding the policy-making responsibilities it planned to allocate to the Commander position, the Commission had the constitutional and statutory authority to create the position. We observed that because the unclassified position did not currently exist, the Commission was required to rely on the NOPD's representations as to how it planned to implement the position. Indeed, we emphasized what "would" occur, stating: "the Commission found that the NOPD had provided sufficient evidence to demonstrate that the police commander position would have policy-making autonomy and that the positions would include a fair hiring process for all applicants." Orazio 2 , 17-1035, pp. 5-6, 248 So.3d at 749 (emphasis supplied).
The NOPD's promises to allocate policy-making responsibilities to the Commander position triggered the 2018 Audit. In Orazio 2 , we observed that when the case was orally argued before this court, the 2018 Audit had not yet been completed. We emphasized that "if the audit found that the police [C]ommander position no longer qualified for unclassified service, the Commission had the authority to revoke the unclassified status of the position." Orazio 2 , 17-1035, p. 5, n. 6, 248 So.3d at 749 ; see Civil Service Rule III, § 7.2.[16]
Given those circumstances, we concluded in Orazio 2 that the NOPD had adequately demonstrated its intent to allocate the necessary policy-making authority to the position and affirmed the creation of the position. Our holding in Orazio 2 , thus, was that the Commission had the constitutional and statutory authority to create the unclassified Commander position; we did not pass judgment on the Commander position. Again, when we decided Orazio 2 , *351 we did not have the benefit of the 2018 Audit.
Unlike in Orazio 2 , we are presented here with the issue of whether, having the benefit of the 2018 Audit, the requirements for unclassified status are satisfied. Stated otherwise, we are presented with the issue of whether the Commander position, as now implemented, satisfies the requirements for unclassified status. Although the Commission answered that question in the affirmative, we find the Commission manifestly erred in reaching that conclusion.
The requirements for creating an unclassified position are set forth in Civil Service Rule III, § 7.1, which imposes the following three requirements to create an unclassified position: (i) the position must be inappropriate for classified employees; (ii) the position must be "of a sensitive nature, having considerable discretion and policy-making authority, which is not subject to further review or modification"; and (3) the position must be regularly audited by the CSD to determine if it should remain unclassified. Because Rule III, § 7.1 uses the connector "and," these three requirements are conjunctive and must all be met. See La. C.C.P. art. 5056 (providing that "[t]he word 'and' indicates the conjunctive). We separately address each of these requirements.
Inappropriate for Classified Employees
In all its iterations, the Commander position has been noted to be indistinguishable from the classified positions of Major and Captain. Then-Superintendent Serpas acknowledged this point in his letter proposing the creation of a Colonel position; he stated that the proposed position would be similar to the existing classified position of Major. Likewise, this was the reason the CSD staff questioned the proposed Colonel position, noting that the proposed "hybrid" Colonel position could not be distinguished from the existing classified positions of Major and Captain.
The CSD staff voiced the same concerns in both their 2017 and 2018 audit reports. In their 2017 report, which focused on the special rate of pay assignment, the CSD staff stated that "[t]he Police Commander job description recently provided by the Police Department is very comparable to and not distinctly different from the classified Police Captain job description." Likewise, in their 2018 report, the CSD staff stated that "there is no fundamental differen[ce] in the job specification between that of Police Captain and the present unclassified Police Commander."
The NOPD does not dispute the CSD staff's finding that the job description for the unclassified Commander position is indistinguishable from the job description for the classified Captain position. Instead, the NOPD contends that the mere fact that Captains performed these duties in the past and that the job description for Captain includes the responsibilities now assigned to Commanders does not require a finding that those job duties are inappropriate for the unclassified service. The NOPD, however, fails to offer a valid reason for ignoring that, in the past, the job responsibilities assigned to the Commander positions historically have been filled by classified employees. Nor does the NOPD distinguish the unclassified Commander positions from the existing classified Major and Captain positions. As noted, the CSD staff's recommendation is that the position is best filled by a classified employee. This factor is thus not satisfied.
Policy-Making Position
The second factor is that the proposed unclassified position must be a policy-making one. See Mathieu , supra . (observing "non-policy forming" public employees are merit-based selected-classified *352 employees). At the hearing, Mr. Hagmann explained that the rule limiting unclassified positions to those with policy-making authority has to be interpreted using a reasonableness standard. He stated that the problem with the Commander positions is that the NOPD is "digging too deep" below people who can act "bona fide second in command." In the NOPD's organizational structure, Commanders rank third in command-below the Superintendent and Deputy Superintendents, above the Captains and Lieutenants.
Likewise, the CSD's director, Ms. Hudson, stated at the hearing that the CSD staff, in conducting the audit, focused on whether the Commanders created policies that affected how the entire department operates overall or policies that affected only the people under them in their division or district. She stressed that the CSD staff, in their audit, observed "policies that affected the division and not the department." Thus, the CSD staff concluded in their 2018 Audit that the Commanders are non-policy making employees. As Ms. Hudson, noted, "[w]hen the constitution was created limiting unclassified positions to the director[,] deputy director[,] and secretary it was limiting so that we were not creating lots of unclassified." She stressed that "[t]he idea is for most of the people who operate in the departments to be in the merit system unless there is some important exception." The record does not support a finding of any such exception. This factor, thus, is not satisfied.
Regular Audit of Position
The third, and final, factor is that the position must be regularly audited to determine if it satisfies the requirements for unclassified status. The Commander position has been the subject of two audits-the 2017 audit, which was focused on the special rate of pay assignment; and the 2018 Audit, which focused on the unclassified Commander positions. Both audits concluded that the Commander position failed to satisfy the requirements for unclassified position status. This factor, thus, is not satisfied.
Given the record does not support a finding that any of the three factors set forth in Civil Service Rule III, § 7.1 is satisfied, the Commission's ruling reauthorizing the sixteen unclassified Commander positions is manifestly erroneous.
DECREE
For the foregoing reasons, the Commission's ruling reauthorizing the unclassified Commander positions is reversed. The Commission's other two rulings are affirmed.
AFFIRMED IN PART; REVERSED IN PART

This court, on its own motion, consolidated the two present appeals-2019-CA-0230 and 2019-CA-0231. For ease of discussion, we reference these two appeals as a single appeal.

Simply stated, a Commander is a middle level manager. The sixteen Commanders are equally divided into two groups-eight of them each head one of the eight geographic police districts; the other eight each head one of eight special divisions. As discussed elsewhere in this opinion, there have been three iterations of the Commander position.

Only a final judgment of the Commission is appealable. The Commission's September 20, 2018 ruling denying Plaintiffs' motion for an evidentiary hearing arguably is not a final judgment. See Spencer v. Dep't of Health & Human Res., Ruston State School , 392 So.2d 149, 150 (La. App. 1st Cir. 1980) (observing that "Article 10, Section 12 of the Louisiana Constitution of 1974 clearly indicates that an appeal from a judgment of the Civil Service Commission is permitted only when that judgment becomes final"). Nonetheless, "[i]t is well-settled that although an interlocutory judgment may not itself be immediately appealable, it is nevertheless subject to review by an appellate court when a judgment is rendered in the case which is appealable." Favrot v. Favrot , 10-0986, p. 2, n. 1 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1102 (citing People of the Living God v. Chantilly Corp ., 251 La. 943, 207 So.2d 752 (1968) ). Since Plaintiffs' appeal is taken from a final Commission ruling, their claim challenging the denial of their motion for an evidentiary hearing is likewise properly before us on appeal.

Superintendent Serpas' October 27, 2010 letter stated as follows:
We are requesting that Civil Service explore the possibility of creating a "hybrid" position to address the needs of NOPD management as it relates to allowing more flexibility in assigning command positions within the Department.
The position created would be similar to police major and/or police colonel (new title) with a fifteen (15%) difference between current base pay of police captain and police major. If the hybrid position is created in the classified pay plan we would prefer it being non-permanent to allow for flexibility in choosing best suited candidates. The Department will develop the evaluation criteria to choose and monitor employees selected for the "hybrid" position(s) and will provide measurements upon request to the Civil Service Commission.
It is also requested that when considering the formulation of the announcement you allow for current police lieutenants and captains to be considered as minimum qualifiers for the hybrid position.
It is requested that Civil Service provide an opinion in writing relative to the feasibility of implementing and/or introducing this "hybrid" position as a departmental management tool.

La. R.S. 33:2397(4) provides that the Commission shall:
Make, either at the direction of the mayor or upon the petition of any citizen for just cause, or upon its own motion, any investigation concerning the administration of personnel in the city service, and review and modify, or set aside, any action by the department which the commission determines to be desirable or necessary in the public interest.

Civil Service Rule III, § 7.3 provides:
The Commission shall have the authority to initiate such audits and investigations of positions placed in the unclassified service by the Commission, as deemed necessary to protect the integrity of the merit system and maintain an equitable relationship between positions in the classified and unclassified services.

Plaintiffs petitioned the Commission to suspend the Commanders' special rate of pay rule and to prohibit then-Superintendent Michael Harrison from appointing employees to the Commander assignment until the CSD completed its job study. In its order denying Plaintiffs' petition to suspend, the Commission stated that it would "adhere to the Fourth Circuit's order and conduct an evidentiary and contradictory hearing prior to taking any action regarding the special rate of pay afforded to police commanders." This court denied Plaintiffs' writ application seeking relief from the Commission's denial of their petition to suspend. Orazio v. City of New Orleans , 16-1278 (La. App. 4 Cir. 3/7/17) (unpub .).

The Commission's ruling was memorialized in a minute entry, which states:
This matter came before the Commission on April 10, 2017. After entertaining public comment, the Commission unanimously GRANTED the Police Department's request to create 16 Unclassified Police Commander Positions pursuant to Rule III, Section 7.1(a)-(c). The Commission further directed the Civil Service Department to complete the audit of the 16 Unclassified Commander Positions required by Rule III, Section 7.1(c) by April 30, 2018 [ ("the 2018 Audit") ].

Before the special meeting, in July 2018, Plaintiffs filed a motion for an evidentiary hearing, styled: "Motion for Status Conference for a Trial before the Hearing Officer." As discussed elsewhere in this opinion, in September 2018, after the special meeting, the Commission denied Plaintiffs' motion.

According to the United States Supreme Court, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack , 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Another definition of a moot case is "[a] matter in which a controversy no longer exists; a case that presents only an abstract question that does not arise from existing facts or rights." BLACK'S LAW DICTIONARY (10th ed. 2014). According to the jurisprudence, "a moot question is usually one that no longer is arguable because it has already been decided." Gertrude Block, Writing Tips , 19-APR Pa. Law. 46, 46 (1997).

As noted elsewhere in this opinion, the request for a Major's examination was made by PANO and three Captains, two of whom are Plaintiffs. This issue also was raised in Plaintiffs' petition and is intertwined with the issue of whether the unclassified Commander positions were legally created. Indeed, the CSD's 2018 Audit recommends the creation of a classified Commander position to replace the existing Major position.

Pursuant to the catchall provision, the Civil Service Commission has adopted Civil Service Rule III, § 7.1, which is the governing rule in this case. Civil Service Rule III, § 7.1 provides:
At its discretion, the City Civil Service Commission may add additional positions to the unclassified service, if: (a) after a thorough review and analysis of the duties and responsibilities of the position, the Commission has determined that they neither are appropriate for, nor should they be performed by, a classified employee and, (b) the position is essentially of a sensitive nature, having considerable discretion and policy-making authority, which is not subject to further review or modification and, (c) the position is audited on a regular basis by the Civil Service Department to determine the continuing appropriateness of the unclassified status.

See Civil Serv. Comm'n v. City of Opelousas , 13-701, p. 6 (La. App. 3 Cir. 12/11/13), 130 So.3d 20, 24 (quoting trial court's written reasons for judgment and observing that "unclassified service is an exception to the general rule that employees, other than the specific unclassified employees, are to be classified and subject to the Civil Service Rules and therefore the Court, by statutory interpretation is bound to strictly construe the provisions of law"); Sewerage & Water Bd. of New Orleans v. Barnett , 255 So.2d 637, 638-39 (La. App. 4th Cir. 1971) (citing State ex rel. Murtagh , supra , and observing that "such provisions must be strictly construed in that they provide an exception" and that "it is axiomatic that the Board is not entitled to the relief sought [of creating an additional unclassified position] unless it is shown that the position which it seeks to create comes clearly within the exception of unclassified service").

The 2018 Audit also recommended the creation of a classified Commander position, which would replace the Major position.

At oral argument before this court, the Commission's counsel characterized the Commanders as de facto chief executive officers of their respective division or district.

Civil Service Rule III, § 7.2 provides as follows:
The Commission may revoke a position previously allocated to the unclassified service if: (a) the Commission determines that the position no longer meets the prerequisites for continuing in the unclassified service, or (b) appropriate classifications and/or registers of eligibles are now in existence which can be utilized to fill the position in the merit system, or (c) after further review it has been determined that organizational changes warrant either abolishing the position or reallocating the duties and responsibilities to other position(s) in the classified service.